**GENERAL OFFICE PRODUCTS CORP., Plaintiff,**

v.

**GUSSCO MANUFACTURING, INC., Defendant.**

Civ. No. 83–1413(JAF).

United States District Court, D. Puerto Rico.

May 28, 1987.

Philip E. Roberts, San Juan, P.R., for plaintiff.

Ana Matilde Nin, McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P.R., for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

This is a diversity-of-citizenship suit now before us on cross-motions for summary judgment. 28 U.S.C. sec. 1332; Fed.R. Civ.P. 56. The case presents an issue of first impression under Puerto Rico's Dealers' Act, Law 75, of June 24, 1964, as amended, 10 L.P.R.A. secs. 278–278d (Law 75). The same involves a Puerto Rico-based commercial distributor suing his principal, the manufacturer and supplier of certain products, for damages as a result of an impairment of contractual relations by the latter.

It is a known fact to those close to Puerto Rico's commercial and industrial community, that Law 75 provides that, notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause. 10 L.P.R.A. sec. 278a.

After a careful review of the cross-motions and supporting documents, in light of the pleadings and documents on file, we find that there is no genuine issue of fact which precludes the granting of summary judgment on behalf of plaintiff on the issue of liability. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985 (1st Cir.1983); *United States v. Del Monte De Puerto Rico,* 586 F.2d 870 (1st Cir.1978); *Rivera Morales v. Benitez de Rexach,* 541 F.2d 882 (1st Cir.1976). We now find that the defendant, as a matter of fact and law,

performed acts detrimental to the established relationship.

## I.

Back in 1978, Garriga Trading & Co., Inc., later reorganized and incorporated as General Office Products Corp. (General), negotiated an exclusive distribution contract with Gussco Manufacturing, Inc. (Gussco), to sell Gussco's office supplies in Puerto Rico and the U.S. Virgin Islands.[1] The original letter exchange between the parties establishes that General initiated the negotiations and Gussco agreed to General distributing the office supplies' line. Garriga, and eventually General, became Gussco's exclusive agent and distributor in Puerto Rico. Once Gussco accepted General's offer, the terms of the same bound both parties. Article 82, Commerce Code of Puerto Rico, 10 L.P.R.A. App. I sec. 1302 (1932). *See* Garriga/General's letter to Gussco of September 12, 1978, and Gussco's response and acceptance of November 8, 1978.

Following the above, Gussco wrote to its dealers and retailers that Garriga Trading (now General) was sole distributor of the complete line of Gussco products in Puerto Rico. Thereafter, the parties commenced their commercial relationship. Gussco manufactured the office products in New York, only selling at the wholesale level throughout the continental United States and Puerto Rico. In Puerto Rico, General sold Gussco products to some three hundred customers. This occurred on a yearly basis until the year 1982.

Sometime in 1982, a third party, A.M. Capen's & Sons (Capen's), a New Jersey-based corporation, began selling Gussco products in Puerto Rico on a wholesale basis.[2] The source of the offices supplies which Capen's was introducing in Puerto Rico was Gussco. General complained and

---

**1.** The reorganization of Garriga Trading and the incorporation of General to assume all of Garriga's commercial activities was realized with Gussco's knowledge and consent. Therefore, the original contract continued in full force and effect as a result of the operating Civil Code contractual novation. *Marina Industrial, Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64, 85 (1984).

**2.** The issue of Capen's liability for alleged interference with the captioned parties' relationship is subject to an independent action pending before this court, No. 83–2407 (Gierbolini, J.). Said action was stayed subject to the resolution of this case.

required Gussco to stop selling to Capen's. An alternative request was made to the effect that Gussco inform Capen's that it would not honor orders destined for the Puerto Rico market.[3] It appears that the parties initially contemplated as an alternative solution to the problem that Gussco would not honor Capen's orders for Puerto Rico. However, Gussco failed to perform and remained uncooperative. General wrote to Gussco on August 25, 1982, stating:

> Bear in mind that our interest is the same which we have proved over the last four years, and that the results have been the placing of Gussco as the leader in the market, possition [sic] which was very far from being when we obtained the line.
>
> In addition, our letters of June 9th, June 28th, and August 10th, remain unanswered. Your response will be highly appreciated.

The August 25, 1982 letter, and several others, remained unanswered until May 11, 1983, when Gussco responded:

> Now that we have your letter of May 9th, we are guessing that you are holding up payments and ignoring messages because of your dissatisfaction with the fact that our merchandise is being sold in Puerto Rico at prices that you cannot meet.
>
> Our policy is not to dictate to our customers where they can resell our products. If an exporter or any other customer chooses to sell our product in Puerto Rico, we are not in a position to stop him and *in the normal course of events would not even be aware of what areas they reach.* (Emphasis added).

On June 14, 1983, Gussco reaffirmed its decision to continue selling to Capen's items that would be placed in the Puerto

Rico market. General sued Gussco asserting:

> [t]hat in 1981, and without the consent of plaintiff and its then [sic] knowledge, defendant breached its exclusive distributorship agreement with plaintiff by selling part of its products to a firm in Puerto Rico in competition with plaintiff, which breach was forgiven by plaintiff upon the promise of defendant to refrain from like conduct in the future.

Gussco's answer to the complaint contains a general denial regarding a Law 75 cause of action. They claim that General's distribution contract was never terminated, even though General ceased buying from Gussco after the filing of the complaint. Gussco further claims that General's requests regarding Capen's, if agreed to, would place Gussco in a pattern of conduct violative of antitrust laws. As stated earlier, we find for plaintiff on the issue of liability.

## II.

The Legislature of Puerto Rico enacted Law 75 with the purpose of injecting stability and creating leverage between the parties to a distributorship contract, in order to impede arbitrary impairments or terminations by principals after a distributor had created a favorable market for its product. *See* 18 *Diario de Sesiones* 1531 (1964); *Marina Industrial, Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64, 85 (1984);[4] *Rosario, Inc. v. Amana Refrigeration,* 733 F.2d 172, 173 (1st Cir.1984).

Law 75 has been attacked several times as unconstitutional, both in Federal and local courts. The act has survived as constitutional. *See, e.g., San Juan Mercantile Corp. v. Canadian Transport Co., Ltd.,* 108 D.P.R. 211 (1978); *J. Soler Mo-*

---

**3.** It is undisputed that Gussco was informed of this situation. The controversy is around the fact of whether Capen's had knowledge of the situation. *See General Office Products v. A.M. Capen's & Sons, Inc.,* 780 F.2d 1077 (1st Cir. 1986).

**4.** This case clearly reflects that the legislative intent was to equalize the parties' bargaining power and to balance the contractual conditions

of two groups economically unequal in their strength, so as to achieve a reasonable stability in distribution relationships. The distributor was to be not only protected from arbitrary terminations, but also from undue practices on the part of principals or grantors. *See, e.g., San Juan Merc. v. Commission Transport Co.,* 108 D.P.R. 211, 216 (1978); *Walborg Corp. v. Tribunal Superior,* 104 D.P.R. 184 (1975).

tors v. Kaiser Jeep Int'l., 108 D.P.R. 134 (1978); Warner-Lambert Co. v. Superior Court of Puerto Rico, 101 D.P.R. 378 (1973); Merle v. West Bend Co., 97 D.P.R. 403 (1969); González v. Brown Group, Inc., 628 F.Supp. 436 (D.P.R.1985); Franceschini, Inc. v. Riley Co., 591 F.Supp. 414 (D.P.R.1984); Pan American Computer Corp. v. Data General Corp., 562 F.Supp. 693, 701 (D.P.R.1983). Cf., Sudoest Import Sales Corp. v. Union Carbide Corp., 732 F.2d 14, 16 (1st Cir.1984); Gemco Latinoamerica, Inc. v. Seiko Time Corp., 623 F.Supp. 912, 918 (D.P.R.1985) (court left open issue of whether the manufacturer allowing distributors in parallel markets to sell their product in Puerto Rico was allowable under Law 75).[5]

In 1966, the Legislature of Puerto Rico amended Law 75 to eliminate any loopholes. In the Report of the Committee on Industry and Commerce, House of Representatives, recommending the approval of Senate Bill 266 (1966), it was stated that:

> Even though the legislative intent when they approved said law [75] is perfectly clear, [it] is convenient that its provisions are made [each day] more specific as to impede any and all intent of evasion.... The amendments introduced by this Bill are with such purpose: to establish with absolute clarity the legislative will in which such law based itself since its inception....
>
> Therefore, one of the proposed amendments has the *purpose of establishing with absolute precision that the law covers not only the case of a distributor who is deprived of the distribution of a product without just cause, but also every situation of impairment of a line of distribution.*

IV *Servicios Legislativos* 637–38 (1966) (translation ours; emphasis added).

The purpose of the 1966 amendment was to cover cases where the principal impairs the distributor's contractually-acquired rights. Colón, W. & Colón, R., *El Contrato de Distribución o de Agencia Comercial*, 27 Revista de Derecho Puertorriqueño 225 (1968). It is clear that the 1966 amendment adding the impairment-of-contract cause of action intends to cover this type of parallel market distributorship in contravention of a voluntarily-established exclusive contract.

Furthermore, it is also evident from a reading of the legislative intent and case law, that Law 75 does not impose exclusivity of distribution upon manufacturers or suppliers. See *Córdova & Simonpietri Ins. v. Chase Manhattan Bank*, 649 F.2d 36 (1st Cir.1986). The principal's obligation under the law is to not impair the distribution relationship (whether exclusive or not) either by delaying the transmittal of orders placed, by discriminating negatively in prices or by defaulting its obligations as stated under the contract, and to not terminate the contract unilaterally without just cause.[6] The law imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so. The clear burden imposed is to deal in good faith with his contracting party and not to impair the established relationship, whatever the relationship is. A principal or manufacturer cannot tamper around with the dealer's rights as established by their voluntary negotiations. Here, Gussco appointed General as an exclusive distributor. That was the option that Gussco elected to follow. Said option binds Gussco as a valid obligation under Law 75. As such, the same is

---

5. A review of these cases reflects that their applicability to the present suit is indirect. Precedents in this area of the law only deal with termination of contracts by manufacturers or main suppliers of products and services. The type of controversy now before us deals with a manufacturer who *incurs in acts which impair the contractually-acquired rights of a distributor to distribute in his assigned market.* In this sense, plaintiff's cause of action is of first impression.

6. "[N]o principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." 10 L.P.R.A. sec. 278a. "If no just cause exists for the termination of the dealer's contract for detriment to the established relationship ... the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of the damages caused him." 10 L.P.R.A. sec. 278b.

not offensive to the United States Constitution. It follows that the controversy in this case is not one of a constitutional nature, but one that involves contract interpretation. We only need to establish the extent of the rights and obligations of both parties.

## III.

Law 75 clearly states that dealer contracts shall be interpreted pursuant to the laws of the Commonwealth of Puerto Rico. 10 L.P.R.A. sec. 278b–2 (Supp.1985); *e.g.*, *Southern Int'l Sales v. Potter & Brumfield Div.*, 410 F.Supp. 1339 (S.D.N.Y.1976). In Puerto Rico, a civil-code jurisdiction, a contract exists once the parties have agreed upon the object of the transaction, with consideration present. Art. 1230, Civil Code (1930), 31 L.P.R.A. sec. 3451; art. 82, Commerce Code (1932), 10 L.P.R.A. App. I sec. 1302.[7] A contract is valid irrespective of form. It can be oral or written. The contract before us is a commercial contract,[8] *Waterman Export Corp. v. Valdejulli*, 88 D.P.R. 499, 504 (1963), regulated by the Commerce Code, 10 L.P.R.A. App. 1 secs. 1001–1912 (1932) (of specific application are secs. 1301–1314). Article 81 of the Commerce Code establishes that:

> Commercial contracts in so far as the requisites thereof are concerned, the modification, exception, interpretation, and extinction thereof, and the capacity of the contractors, shall be governed, in all that is not expressly established in this Code or in special laws, by the general rules of common law.

10 L.P.R.A. App. I sec. 1301 (1932).

When the contract dispute cannot be resolved under the dispositions of the Commerce Code, the Civil Code fills in the gap as common-law or suppletory legislation. *See Puerto Rico Bedding Mfg. Corp. v.*

*Herger*, 91 D.P.R. 519, 525 (1964). Sections 82 and 85 of the Commerce Code, 10 L.P.R.A. App. I secs. 1302, 1305, declare valid and enforceable this type of contract reduced to writing in a letter exchange.[9] The Commerce Code states that the parties subject to a commercial contract shall execute and comply with the same *"[i]n good faith ... without evading the honest, proper, and usual signification of written or spoken words with arbitrary interpretations nor limiting the effects which are naturally derived from* the manner in which the contractors may have explained their wishes and contracted their obligations." Art. 88, Commerce Code, 10 L.P.R.A. App. I sec. 1308 (emphasis added).

Here, even though the contract contained in a letter exchange is by no means a model form, the intention of the parties is quite clear—Gussco granted exclusivity to General for Puerto Rico distribution. Gussco never meant, and the contract cannot be interpreted to mean, that the exclusivity was for Gussco to contact or establish other distributors in Puerto Rico. The clear intention of the parties prevails. *See Merle v. West Bend Co.*, 97 D.P.R. 403, 409–11 (1969). Said intention has been expressed here by the parties' conduct, both prior and subsequently to the execution of the contract. Articles 1233, 1234, Civil Code (1930), 31 L.P.R.A. secs. 3471, 3472; *Bco. de la Vivienda de P.R. v. Pagán Ins. Underwriters*, 111 D.P.R. 1, 6–7 (1981); *Marina Industrial*, 114 D.P.R. at 69–70.

## IV.

An exclusive distributorship is simply a mechanism by which a supplier agrees to sell its products for resale to a single distributor in a given region. This implies not authorizing *other distributors for the*

---

**7.** This section establishes that:
> Commercial contracts shall be valid and shall cause obligations and causes of action whatever may be the form and language in which they are executed, the class to which they belong, and the amount of the contract, provided their existence is shown by any of the means provided by civil law.

**8.** Martínez-Val, J., *Derecho Mercantil* 27–29 (Ed. Bosch 1979), explains the concept of "acts of commerce," which is adopted by our Commerce Code, as those which are generated in the commercial traffic, those which are related, and those which are so classified by law.

**9.** See also on this point the treatise of Garrigues, J.I., *Curso de Derecho Mercantil* 133–36 (7th ed. 1976).

*same area. It includes abstaining from selling directly to other commercial outlets in the region.* ABA Antitrust Section, Monograph No. 9, *Refusal to Deal and Exclusive Distributorship* (1983) (emphasis added). It has been commented that a distributor has a cause of action under Law 75 when the manufacturer establishes a second or parallel contract of distribution after having entered into an exclusive one. *See* Estrella, A., *The Dealer's Contractual or Commercial Distributorship: Nature of the Relationship, Termination of the Contract,* 31 Revista del Colegio de Abogados de Puerto Rico [Rev. Col. Ab. P.R.] 241, 251 (1967). Obviously, once General informed Gussco of the interference of a third party in its contractually-acquired exclusive market, Gussco's obligation was to take an affirmative step toward acting in accord with its contractual obligations. Gussco was not required to stand as a vigilant dog, its duty accrued once it was informed. In this case, General notified Gussco of Capen's sales in Puerto Rico. Gussco could have discharged its duty, making Capen's aware of its market interference and by taking measures so that Capen's would not interfere with the Puerto Rico market. Such actions would not have been unlawful *per se* under antitrust laws. *United States v. Parke-Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *FTC v. Beech Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *United States v. Colgate Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Therefore, we find no conflict between Law 75 and the antitrust laws.[10]

Accordingly, plaintiff's motion for partial summary judgment on the issue of liability is GRANTED. The impairment seems to

have commenced on or around 1981 and continued throughout 1983, until plaintiff recurred to filing the instant judicial action, concurrently with the ceasing of placing orders. *See* affidavit subscribed by Julio Garriga, President of General, docket document No. 15. It is during this time period that plaintiff has the burden of proving its damages. *Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939).

We note that plaintiff should not bank on this ruling so as to read that it is entitled to a money judgment. This record is suggestive of the fact that, even though liability is present, General was about to conclude its relationship with Gussco in any event, sooner or later. The record suggests that General now manufactures its own products and still sells the same line of items. This only means that an examination of conscience, both parties, is in order. Perhaps they can dispose of this case by settlement or otherwise.

A Settlement Conference is scheduled to be held June 12, 1987, at 8:30 A.M. If case cannot be settled, a Pretrial Conference shall be held on June 19, 1987, at 8:30 A.M. Parties to expect a trial setting before July 31, 1987.

IT IS SO ORDERED.

---

**10.** Cases where the buyer contractually requires that its supplier sell exclusively to it are ruled under "rule of reason." *See Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Monsanto v. Spray Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1976). Territorial restraints of vertical nature, such as those which

may be contained in franchising agreements, are analyzed under rule of reason because they promote intrabrand competition by allowing franchisor or manufacturer to achieve certain efficiencies in distribution of goods and services. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705 (11th Cir.1984); *see generally,* Barber, C., *Refusals to Deal under the Federal Antitrust Laws,* 103 U.Pa.L.Rev. 847 (1955).