**VULCAN TOOLS OF PUERTO RICO, Plaintiff, Appellant,**

v.

**MAKITA USA, INC., Defendant, Appellee.**

No. 93–2089.

United States Court of Appeals,
First Circuit.

Heard March 8, 1994.

Decided May 4, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied May 25, 1994.

Wilfredo A. Géigel, with whom Law Offices of Wilfredo A. Géigel was on brief, for appellant.

Arturo J. Garcia–Sola, with whom Manuel Fernandez–Bared and McConnell, Valdes were on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

Does the Dealers' Act of Puerto Rico, Act 75 of June 24, 1964, P.R. Laws Ann. tit. 10, §§ 278–278d (1976 & Supp.1989) ("Law 75" or the "Act"), come into play where the sales

or market share of a non-exclusive distributor decline after its supplier establishes additional non-exclusive distributors for its products in Puerto Rico? Because we answer this question in the negative, we affirm the district court's grant of summary judgment for the defendant.

# I.

## BACKGROUND

The following facts are undisputed. Plaintiff-appellant, Vulcan Tools of Puerto Rico, Inc., sells and services power tools manufactured by a Japanese company, Makita Corp. Vulcan has distributed Makita products since May 1983, when it entered into a non-exclusive distribution contract with defendant-appellee, Makita U.S.A., Inc. ("Makita"), a subsidiary of its Japanese parent.

At the time Vulcan became a non-exclusive distributor for Makita, the latter already had three other non-exclusive distributors operating in Puerto Rico. In 1988 Makita appointed a sales representative in Puerto Rico and authorized thirty-four additional non-exclusive distributorships on the island. Vulcan continued to sell and service Makita tools. While the sale of Makita products in Puerto Rico has more than tripled since 1988, Vulcan's total sales of the same and its market share have fallen.

In February 1989 Vulcan filed this action in the United States District Court for the District of Puerto Rico alleging that Makita had impaired the existing relationship between the parties without just cause in violation of Law 75. The district court granted summary judgment in favor of Makita. This appeal ensued.

1. In the complaint, Vulcan also alleged that Makita violated Law 75 by (1) appointing a sales representative in Puerto Rico and (2) allowing the importation into Puerto Rico of Makita power tools that did not meet the requirements of the Occupational Safety and Health Act ("OSHA"). Vulcan did not, with respect to the former claim, contest summary judgment below, and has not pressed either of the claims on this court. Consequently, they have been waived on appeal. *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1113 (1st Cir.1993) (issues that surface for the first time on appeal or are raised in a perfunctory manner on appeal are deemed waived).

# II.

## DISCUSSION

On appeal Vulcan argues (1) that the district court abused its discretion in entertaining Makita's motion for summary judgment, and (2) that summary judgment was improvidently granted because whether Makita's hiring of thirty-four additional distributors in Puerto Rico impaired Makita's established relationship with Vulcan is a disputed question of material fact.[1]

### A. Timeliness of Makita's Summary Judgment Motion

On November 4, 1991 the Magistrate Judge assigned to the case issued a "Final Pretrial Conference Report" which established December 15, 1991 as the date for completing outstanding discovery, and December 30 as the deadline for filing dispositive motions. Vulcan argues on appeal the same argument rejected below: that because Makita's motion for summary judgment was not filed until August 3, 1993, the motion was untimely, and the district court was barred from considering it under Fed.R.Civ.P. 16(b) and 16(e).[2]

Because trial judges must be able to control the management of their cases, we review a district court's decision to modify a pretrial scheduling order under an abuse of discretion standard. *See Anda v. Ralston Purina, Co.*, 959 F.2d 1149, 1155 (1st Cir. 1992); *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1020 (1st Cir.1988); *see also Ramirez Pomales v. Becton Dickinson & Co.*, 839 F.2d 1, 3 (1st

2. Rule 16(b) instructs district courts to enter scheduling orders limiting the time to, *inter alia*, file motions and complete discovery. Under this rule, "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." Rule 16(e) provides, in pertinent part, that once a pretrial order is entered, it "control[s] the subsequent course of the action, unless modified by a subsequent order."

Cir.1988) (decision to modify a pretrial order is subject to the trial court's discretion). Moreover, pretrial orders are to be liberally construed, James W.M. Moore, et al., *Moore's Federal Practice,* ¶ 16.19, at 16–90 (2d ed. 1993) (citing cases). Thus we are loathe to upset a district court's interpretation of its own order. *See Martha's Vineyard Scuba HQ. v. Unidentified Vessel,* 833 F.2d 1059, 1066–67 (1st Cir.1987) (citing cases) (recognizing "the special role played by the writing judge in elucidating the meaning and intendment of an order which he authored").

■ The district court determined that the deadline for filing dispositive motions established in the magistrate's order was vacated by a subsequent order issued by the court in which no such deadline was set, and that Makita's motion was therefore not untimely. The sequence of events is as follows. In March 1992 Vulcan moved to have a trial date set. Makita objected on the ground that the case was not ready for trial, in part, because Vulcan had not responded to various document requests and the deposition of Vulcan's President, Joseph Fayer, had not yet concluded. On April 27, 1992, in response to Makita's objections, the district court granted Vulcan additional time to produce specified documents, set deadlines for various depositions, ordered that discovery be completed by June 30, 1992, and referred the case to the magistrate judge for the scheduling of another pretrial conference. The court further instructed the parties to submit a revised proposed final pretrial order.

The parties submitted a proposed final pretrial order in August 1992, which was approved by the court six days later. Neither that order nor the April 27 order, set a deadline for filing dispositive motions. The district court viewed its decision to reopen discovery as vitiating the existing deadline for the filing of dispositive motions. *Vulcan Tools of Puerto Rico, Inc. v. Makita U.S.A., Inc.,* No. 89–148, 1993 WL 719565, slip op. at 6 (D.P.R. Sept. 1, 1993). Because the original cut-off date for filing dispositive motions fell after the original discovery deadline, the court's finding that a change in the latter necessarily abolished the former is eminently

reasonable. While it is true that Makita did not specifically request an extension of time for filing a motion for summary judgment, the court could have concluded that the "good cause" Makita demonstrated for extending the discovery deadline was also good cause for lifting the deadline for filing dispositive motions. We find no abuse of discretion in the court's decision to consider Makita's motion for summary judgment.

## B. *Law 75*

[3] We now turn to the principal issue raised on appeal. Vulcan argues that summary judgment was inappropriate because whether Makita's appointment of thirty-four additional distributors caused a "detriment" to Vulcan (*i.e.,* the subsequent decline in Vulcan's sales and market share with respect to Makita products), is a question of fact for the jury. Vulcan apparently concedes that, under the parties' contract, Makita was entitled to name additional non-exclusive distributors at will, so long as it did not violate Law 75.

We say "apparently," because Vulcan has sent out mixed messages. Although it has made the above concession both in its brief, *Appellant's Brief* at 21, and in oral argument, at times during oral argument Vulcan maintained that, as part of its distribution contract, Makita agreed to limit the number of Makita distributors in Puerto Rico to three. Even if this argument has been properly preserved by Vulcan, it is without merit.

■ The terms of Vulcan's non-exclusive distributorship are set forth in a May 26, 1993 letter from Carl Schwinne, Makita's marketing manager, to Joseph Fayer, Vulcan's president. The letter states: "This letter will summarize our phone conversation today regarding a non-exclusive distributorship for Makita power tools in Puerto Rico." The letter also contains information about Makita's tool order program, payment terms, stock adjustments, Makita's advertising program, and warranty repairs. Vulcan never objected to the contractual terms set forth in the May 26 letter. Vulcan's argument that Makita agreed not to have more than three other distributors in Puerto Rico is based on a conversation that took place on May 18

between Fayer and Frank Isaacs, then Makita's regional sales manager. As evidence of such limitations, Vulcan offered Isaacs' deposition, at which Isaacs testified· as follows:

Q. All right. Getting back to the agreement with Vulcan, as for the setting up of the distributorship, did you or anyone at Makita, to the best of your knowledge and recollection, ever indicate to Mr. Fayer that Makita would operate through only two or three distributors in the market.

A. Yes. I stated that right up front that we—on our visit to him—went and said these are the people—These are the channels of distribution that we're looking at. These are the distributors that we're going to try to sell to accomplish our objective in this market, and if—and we told this to each one. If you support our programs, grow our business here, in an acceptable rate, whatever that might be, then we see no reason to pursue any other distributors in these channels.

Q. At that time they didn't see a need for that?

A. That's right.

Q. But that could change?

A. Sure it can.

Q. And the company wanted to make sure that it retained the right to name others, other distributors?

A. Sure. You always retain that right, but if you change your strategy in the marketplace, you need to let your distributors know what that is.

Isaacs' Deposition at 71–72.

The law of Puerto Rico is clear that no oral extrinsic evidence may be admitted to add to, alter or modify a written agreement except when fraud or surprise is alleged. P.R.Laws Ann. tit. 32, App. IV, R. 69(B) (1983) (Parole Evidence Rule).[3] When an agreement leaves no doubt as to the intention of the parties, a court should not look beyond the literal terms of the contract. *Marina Ind. Inc. v. Brown Boveri Corp.*, 114 P.R. Dec. 64, 72 (1983) (Official Translation); *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir.1987). This principle is embodied in Article 1233 of the Puerto Rico Civil Code, which applies to the contract between Vulcan and Makita[4] and determines how courts should interpret a contract where there is a conflict over its meaning:

If the terms of a .contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

P.R.Laws Ann. tit. 31, § 3471 (1990). "For Article 1233 purposes, a term is considered 'clear' when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt." *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F.Supp. 98, 104 (D.P.R.1993) (citations omitted). If the meaning of a contract's terms is sufficiently clear, "the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract." *Id.*

■ There is no doubt that the meaning of the word "non-exclusive," used in the letter of May 26, is clear and unambiguous. Makita named Vulcan as a non-exclusive distributor, and thereby expressly retained the right to name additional non-exclusive distributors at its discretion. Therefore, we need not dwell on the import of Isaacs' testimony, and

---

3. We have recognized that,

> [i]n spite of the general applicability of the Federal Rules of Evidence to diversity actions, it is well recognized that Congress did not intend the rules to preempt so-called "substantive" state rules of evidence such as the parole evidence rule.... Although the application of these rules will affect the admissibility of certain evidence, they in reality serve substantive state policies regulating private transactions.

*McInnis v. A.M.F.,. Inc.*, 765 F.2d 240, 245 (1st Cir.1985).

4. The contract between Vulcan and Makita is a commercial contract, and is thereby regulated by the relevant provisions of the Commerce Code of Puerto Rico, P.R.Laws Ann. tit. 10, §§ 1301–1314 (1976). Where, as is the case here, the Commerce Code does not provide the solution to a question of contractual interpretation, courts must look to the Civil Code and the common law to fill the gaps. *See* P.R.Laws Ann. tit. 10, § 1301 (1976); *General Office Products Corp. v. Gussco Mfg., Inc.*, 666 F.Supp. 328, 331 (D.P.R. 1987).

the alleged promise by Makita that it would limit its distributors in Puerto Rico to three. We move on and address Law 75 directly.

On June 24, 1964, Law 75 became effective. It prohibited "the termination by the principal ... of the relationship derived from a dealer's contract or the refusal to renew said contract on its normal expiration, except for just cause, this, notwithstanding the existence of a clause in the contract reserving to the parties the unilateral right to terminate the existing relationship." *United Medical Equipment Corp. v. S. Blickman, Inc.*, 260 F.Supp. 912, 913 (D.P.R.1966); *see* P.R. Laws Ann. tit. 10, § 278a (1964) (amended 1966). Law 75 was enacted in order to protect the interests of commercial distributors operating in Puerto Rico "from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's product." *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 482 (1st Cir.1994); *see also Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 820 (1st Cir.1988) (reproduction of official translation of Puerto Rico Supreme Court's response to certification question, 122 P.R. Dec. 172 (1988)); *Warner Lambert Co. v. Superior Court of Puerto Rico*, 101 P.R. Dec. 378 (1973) (Official Translation).

The statement of motives behind Law 75 issued by the Puerto Rico House Committee on Commerce and Industry is clear:

> The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers ... or without fully eliminating them, such enterprises gradually reduce and impair the extent of their previously established relationships, as soon as these have created a favorable market and without taking into account their legitimate interests.

Statement of Motives of Act 75, 1964 P.R.Laws, 4th Reg.Sess. 231. Because the legislature of Puerto Rico considered traditional principles of contract law insufficient to protect the rights of dealers, it passed Law 75 to safeguard these rights and stabilize dealership relationships. *Medina & Medina*, 858 F.2d at 820.

In 1966, the Dealers' Act was amended, and assumed its present form:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may *directly or indirectly perform any act detrimental to the established relationship* or refuse to renew said contract on its normal expiration, except for just cause.

P.R.Laws Ann. tit. 10, § 278a (1976). The underlined language was added by the amendment. The 1966 amendment was intended to cover cases where the principal impairs the distributor's contractually acquired rights. *General Office Products v. Gussco*, 666 F.Supp. at 331 ("*Gussco*") (citing W. Colon & R. Colon, *El Contrato de Distribucion o de Agencia Comercial*, 27 Revista de Derecho Puertorriqueno 225 (1968)). *Gussco* involved a claim under Law 75 by the exclusive Puerto Rico distributor of its supplier's office products. The plaintiff alleged that its supplier violated Law 75 by its passivity in the face of a decision by a state-side distributor to enter the Puerto Rican market. The court found "that the 1966 amendment adding the impairment-of-contract cause of action [covers] this type of parallel market distributorship in contravention of a voluntarily established exclusive contract." *Id.; see also* A. Estrella, *The Dealer's Contractual or Commercial Distributorship: Nature of the Relationship, Termination of the Contract*, 31 Revista de Colegio de Abogados de Puerto Rico 241, 251 (1967) (a distributor has a cause of action under Law 75 when its supplier establishes additional distribution contracts after having entered into an exclusive one) (cited in *Gussco*, 666 F.Supp. at 333). We must determine whether the 1966 amendment covers Vulcan's claim.

In order to focus our inquiry, we illustrate Vulcan's argument with the following syllogism: (1) Makita established additional nonexclusive distributorships in Puerto Rico; (2) subsequently Vulcan's sales of Makita tools and its share of the Makita market fell; therefore (3) Vulcan is entitled to a jury trial to determine whether (1) caused (2). This

argument is premised upon Vulcan's assumption that if (1) caused (2), then there has been a "detriment" to the parties' "established relationship," and Makita is liable under Law 75 absent a showing of just cause for its actions. For the reasons set forth below, we disagree with Vulcan's assumption.

█ It is beyond cavil that non-exclusive distributors are entitled to protection under Law 75. *J. Soler Motors v. Kaiser Jeep Int'l,* 108 P.R.Dec. 134, 146 (1978) (Official Translation). It is equally true, however, that Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts. *See Gussco,* 666 F.Supp. at 331 ("The law imposes no prohibition upon the principle of selling or establishing parallel distributorship agreements if he so reserves the right to do so."); *see also Nike Int'l, Ltd. v. Athletic Sales, Inc.,* 689 F.Supp. 1235, 1238 (D.P.R.1988) ("[T]he legislature [of Puerto Rico] did not intend that Law 75 be a safe haven for dealers to avoid the express terms of the contracts to which they willingly subscribe.").

The basic flaw in Vulcan's position emanates from its expansive reading of the phrase "detriment to the established relationship." According to Vulcan, every diminution in the sales or the market share of a non-exclusive distributor attributable to a business decision by its supplier constitutes such a "detriment," and is actionable under Law 75. This spin on Law 75 is unprecedented, and wholly unsupported by any legal authority. Not only would Vulcan's interpretation of the Act grant virtual monopoly status to every supplier's first non-exclusive distributor in Puerto Rico, it would effectively prevent suppliers from raising prices, even when such a right is secured by contract, where doing so would cut into the distributor's sales or profits. This view of Law 75 has already been rejected by the Supreme Court of Puerto Rico. *See J. Soler Motors,* 108 P.R. Dec. at 150 (Official Translation) (manufacturer-imposed increase in price of motor vehicles does not give rise to a Law 75 violation where manufacturer reserved right to do so in distribution agreement); *see also Medina & Medina,* 858 F.2d at 823 (declining to construe Law 75 in such a way that a

dealer could govern its principal's policies resulting in principal's loss of legal and financial autonomy).

As we explained above, the "established relationship" between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights. *Gussco,* 666 F.Supp. at 331. The text of Law 75 makes this point particularly clear. The statutory language defines a "dealer's contract" subject to Law 75 as:

> A relationship established between a dealer and a principal ... whereby the former actually and effectively takes charge of the distribution of merchandise ... on the market of Puerto Rico.

P.R.Laws Ann. tit. 10, § 278 (1976). Consistent with our reading of the Act is the statutory presumption that a principal has impaired the existing relationship when, *inter alia,* "the principal ... establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico or any part of said area *in conflict with the contract existing between the parties.*" P.R.Laws Ann. tit. 10, § 278a–1(b)(2) (Supp.1989) (emphasis added).

The question whether there has been a "detriment" to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired. Here, the contractual relationship between Vulcan and Makita was not affected by Makita's establishment of additional non-exclusive distributors for its products in Puerto Rico. This is because Makita, in its distribution agreement with Vulcan, expressly reserved the right to add distributors in the Puerto Rican market. Where, as is the case here, a dealer's contractually acquired rights have not been impaired in any way, Law 75 does not come into play.

The judgment of the district court is *Affirmed.*