**MADELUX INTERNATIONAL, INC., Plaintiff,**

v.

**BARAMA CO. LTD., et al., Defendants**

**No. CIV.01–1862(HL).**

United States District Court, D. Puerto Rico.

Feb. 15, 2005.

Freddie Perez–Gonzalez, Freddie Perez Gonzalez & Assoc. PSC, Luis A. Vargas–Lopez, Freddie Perez Gonzalez & Assoc.

PSC, San Juan, PR, for Madelux International, Plaintiff.

Alberto G. Estrella, William Estrella Law Offices, Kenneth C. Suria–Rivera, William Estrella Law Offices, San Juan, PR, for Barama Co. Ltd., Defendant.

### *OPINION AND ORDER*

LAFFITTE, District Judge.

Plaintiff Madelux International Inc. (hereinafter "Madelux"), filed an amended complaint against defendants Barama Co. Ltd. (hereinafter "Barama"), Sterling Wood Products, Inc. ("Sterling"), and Aljoma Lumber Inc. ("Aljoma"), alleging that Barama and Sterling terminated Madelux's exclusive sales agreement to distribute plywood in Puerto Rico without just cause in violation of Puerto Rico's Act 75, 10 L.P.R.A. § 278 *et seq.* ("Law 75"). (Docket No. 32, amended complaint.) Defendant Barama, in turn, argues that there was no "dealer's contract" between them and Madelux, and as such Madelux is not a "dealer" under Law 75.

Plaintiff Madelux also brought forth a claim for tortious interference with a contractual relationship against co-defendant Aljoma. Defendant Barama, in turn, filed a counterclaim against Madelux for tortious interference with commerce in violation of Article 1802 of the Puerto Rico civil code.[1]

A bench trial on this matter was held from December 6 through December 8, 2004. At the conclusion of plaintiff Madelux's case, the court granted defendant Aljoma's Rule 50 motion, and entered judgment on December 9, 2004, dismissing all claims against co-defendant Aljoma. (Docket No. 184.)

---

1. Defendants Barama, Sterling and Aljoma are all foreign corporations with principal offices in locations outside of Puerto Rico, and thus the Court has jurisdiction of this controversy pursuant to 28 U.S.C. § 1332.

## FINDINGS OF FACT

Based on all the evidence and testimony presented at trial, as well as the parties' stipulations in the pretrial order, the Court makes the following findings of fact:

1. Madelux International Inc. ("Madelux"), is a corporation organized under the laws of the Commonwealth of Puerto Rico, with principal offices at route 864, Km. 2.1, Hato Tejas Ward in the city of Bayamón.

2. Madelux C.A., is a separate legal entity organized under the laws of Venezuela, with principal offices in Venezuela. Madelux C.A. is not a party to this action.

3. Madelux's owners and/or principals are Tomi Revai, Jozsef Revai, and Enrique Jordán.

4. Tomi Revai, a U.S. citizen, resident of Caracas, Venezuela, conducted almost all of the negotiations on behalf of Madelux with Barama's and Sterling's representatives. Tomi Revai also negotiated the orders on behalf of the Venezuelan corporation, Madelux, C.A.

5. Barama Co. Ltd. ("Barama"), is a foreign corporation duly organized under the laws of the sovereign Republic of Guyana with principal offices in Land of Canaan, East Bank, Demarara, in the Republic of Guyana.

6. Barama operates a wood mill in Guyana and manufactures lumber and wood related products. Barama began selling plywood to Madelux sometime in 1994.

7. In December 11, 1995, Barama mailed a letter to Mr. Tomi Revai at Madelux C.A.'s address in Venezuela, stating: "We wish to confirm that 'Madelux' and 'Castel' are the only buyers for our plywood in Puerto Rico." (Exhibit 2). The letter was signed by K.T.Chung, Barama's Managing Director. The letter was the result of negotiations between Tomi Revai and K.T. Chung. (Testimony Tomi Revai.)

8. Madelux was incorporated in Puerto Rico in March of 1996, after Tomi Revai received the December 11, 1995 letter from Barama to Madelux, C.A. in Venezuela. Thereafter, Madelux made a significant money investment and built a warehouse in Hato Tejas, Bayamón. (Testimony Enrique Roldán.)

9. Castell, who was one of Madelux's competitors in the Puerto Rico market, did not receive a copy of the December 11, 1995 letter from Barama. A copy of the letter was sent by fax to Mr. Carlos Castell by Mr. Roldán from Madelux. Barama did not require that Castell buy a certain amount of plywood, nor that it maintain an inventory. (Testimony Carlos Castell.)

10. Castell purchased plywood from Barama from 1992 until sometime in 1996 or 1997. Carlos Castell decided not to continue doing business with Barama since he experienced some quality problems with the product. (Testimony Carlos Castell.)

11. From 1995 through May of 1999, Tomi Revai conducted business with Barama, mostly through letters and/or e-mails, with several of the managers at Barama, who were of Korean descent. (*See* Exhibits 3–9; Exhibits 11–13).

12. During 1999 there was a change in management at Barama, and as such Mr. James C. Keylon became Managing Director for Barama in May of 1999.

13. On May 31, 1999, Barama announced the appointment of Michael Richardson as its General Sales Manager for the United States market and the Caribbean. (Exhibit 14). Mr. Richardson worked for Sterling Wood Products, a United States corporation, with offices in Phoenix, Arizona. (Exhibit 15.)

14. In a fax/letter by Mr. Richardson dated June 19, 1999, Richardson expressed his concern that: "...purchases from Madelux have all but disappeared." Richardson also stated that the parties' original

intent was to have "monthly minimum contract[s] ... established and consummated." In closing, Mr. Richardson stated: "Barama would like to keep our supply channels with Madelux. Other importers in Puerto Rico whom have expressed interest in Baromally Plywood have approached us. We have advised them that Madelux is currently our distributor and we are staying with that decision until further notice." In addition, Mr. Richardson mentioned that Barama expected Madelux to make a commitment to purchase a monthly minimum of plywood materials in order for the business relationship to continue. (Exhibit 19).

15. Tomi Revai responded to Mr. Richardson's communication by letter/fax on June 21, 1999. In said letter, Revai admits that Madelux had ceased placing orders from Madelux, and blames the higher costs of importing baromally in relation to other kinds of plywood from Brazil, Peru and Ecuador. Revai further stated: "In summary I believe we could restart some reasonable volume orders if baromally would cost C & F our ports 8–10% less than Brazilian plywood ...". The letter further reads: "Please keep also in mind that another reason our orders from Barama became nil, is because from Barama we had to order larger volumes & pay in advance," as opposed to other sources. Revai ends his letter by stating that he hoped they could come up with a workable price that would enable Madelux to resume its regular purchases from Barama. (Exhibit 20).

16. Throughout most of 2000, Madelux and Barama continued their business relationship without significant problems.

17. The business relationship between Barama and Madelux began deteriorating during the last few months of 2000, when Barama failed to fulfill several orders placed by Madelux.[2] In December 7, 2000, Revai e-mailed Lalaram asking him to let him know if Barama could or would ship additional orders to Madelux in Venezuela and Puerto Rico. Revai stated: "Our communications are erratic at best and sometimes I feel that Barama is not interested in our business.... Please confirm if we can depend on regular supplies from you or not." (Exhibit 56).

18. Early in 2001, Barama commenced selling baromally plywood to Aljoma for its resale or distribution in Puerto Rico.

19. The first and only time that the word 'exclusive' is utilized to describe the relationship between Barama and Madelux, is in self-serving letter dated April 20, 2001 written by Revai prior to the filing of this complaint. (Exhibit 57).

20. Barama's sales summaries for the years 1994–2003 details Barama's sales of plywood in the Puerto Rico market. During 1994, Barama sold plywood for distribution in Puerto Rico, to both, "Castell Export Corp." and "Martinez Arias Her, Inc." During 1995, Barama sold plywood to Castell Export Corp., Martinez Arias, Inc., Maderas Tratadas, Inc., and Madelux. (Exhibit 62.)

21. From 1996 through 2000, Barama's only purchaser of plywood in Puerto Rico was Madelux. From 2001 through 2003, Barama sold plywood to Aljoma. (Exhibit 62.)

---

**2.** Revai testified that he had placed some orders in 2000 that were never fulfilled, both for Puerto Rico and Venezuela. Evidence presented during the trial suggests that those orders were partially fulfilled. The Court, however, was not presented with specific details of these unfilled orders; such as, the

amount of plywood ordered; the amount of plywood actually delivered, and the destinations of each unfulfilled order. Mr. Lalaram admitted in his testimony that the some of Madelux's orders were not shipped due to a shortage of logs and a 'price differential.'

22. In 2003 Aljoma's warehouse facilities in Puerto Rico caught fire. Aljoma ceased operations in Puerto Rico. (Testimony of Enrique Roldán.)

23. Mr. Girwar Lalaram became the Managing Director for Barama sometime in 2000.

## DISCUSSION

■ The Court needs to determine whether or not Maledux can be considered a "dealer" for purposes of Law 75. The statute itself does not resolve the matter. *See Triangle Trading Co., Inc. v. Robroy Industries, Inc.*, 200 F.3d 1 (1st Cir.1999). Law 75 defines a dealer as a "person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." 10 P.R.Laws Ann. § 278(a). The statute expands on this definition by explaining that a dealer's contract is a

> relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

*Id.* at § 278(b).

■ Law 75 was enacted "to remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business and had successfully established a market in Puerto Rico for the supplier's product or service." *Re–Ace, Inc. v. Wheeled Coach Industries, Inc.*, 363 F.3d 51, 54 (1st Cir.2004)(citing *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d at 2 (internal quotations omitted)); *see also, V. Suarez & Co., Inc. v. Dow Brands, Inc.*, 337 F.3d 1, 4 (1st

Cir.2003); *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 317 (1st Cir. 1999); *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 870 (1st Cir.1998); *R.W. Intern. Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 51 (1st Cir.1996); *Medina & Medina v. Country Pride Foods, Ltd.*, 825 F.2d 1, 2–3 (1st Cir.1987); *Accessories & Communication Sys., Inc. v. Nortel Cala, Inc.*, 85 F.Supp.2d 95 (D.P.R.2000); *Gonzalez v. Brown Group, Inc.*, 628 F.Supp. 436, 438–39 (D.P.R.1985). Not all business transactions, however, are protected by Law 75. *Garcia v. Duron, Inc.*, 175 F.Supp.2d 135, 138 (D.P.R.2001)(citing *Sheils Title Co. v. Commonwealth Land Title Ins. Co.*, 184 F.3d 10 (1st Cir.1999)). In fact, both federal and local courts have recognized that the statute's broad definition of a 'dealer,' "encompasses a wide range of actors within the distribution process and threatens to extend Act 75's protective sweep beyond the end that the statute sought to achieve." *Re–Ace, Inc. v. Wheeled Coach Industries, Inc.*, 363 F.3d at 55 (citing *Triangle Co., Inc. v. Robroy Indust. Inc.*, 200 F.3d at 4). Thus, the Puerto Rico Supreme Court restricted the definition of a dealer to "an independent entrepreneur who has established a continuing relationship, either fixed or indeterminate, with another principal for the distribution of a product or service ... geared to create, develop, and coordinate a market and to obtain new clients." *Triangle Trading*, 200 F.3d at 4–5 (quoting *Roberco Inc. v. Oxford Indus., Inc.*, 122 D.P.R. 115, 131 (1988)). "From this definition the court derived the following characteristics of a dealership: promotion of the product, keeping an inventory, fixing prices, delivery and billing responsibilities, authority to extend credit, advertising campaigns, assumption of risk, purchasing the product, maintaining facilities, and offering product-related services to clients." *Re–Ace, Inc. v. Wheeled Coach Industries, Inc.*, 363 F.3d at 55–56 (citing *Triangle*

*Trading*, 200 F.3d at 4–5 (citing in turn, *Roberco Inc. v. Oxford Indus., Inc.*, 122 D.P.R. at 131–32)); see also *Lorenzana Torres v. General Accident Ins. Agency*, 2001 WL 854835, 2001 J.T.S. 113 (June 29, 2001). It has been clearly stated in Law 75 jurisprudence that when considering the aforementioned factors, "not all ha[ve] to be satisfied in order to determine that a plaintiff is an Act 75 distributor. Instead, a trial court must consider said factors in light of the evidence presented." *Re–Ace, Inc. v. Wheeled Coach Industries, Inc.*, 363 F.3d at 56 (citing *Re–Ace, Inc. v. Wheeled Coach Indus., Inc.*, 270 F.Supp.2d 223, 232 (D.P.R.2003)).

Here, Madelux fulfills several of the *Roberco* criteria. It is undisputed that Madelux purchased the product (baromally plywood) from Barama, and built and maintained a warehouse in order to store the plywood. (*See* Exhibit 74). Madelux, however, did not present any evidence during the trial as to the way in which the product was promoted, the way in which they fixed the prices or kept their inventory, their advertisement practices (if any), and if they offered any product-related services to their clients. The evidence presented at trial showed that Madelux was under no obligation, written or verbal, to make any purchases from Barama, nor an obligation to keep any inventory. Quite to the contrary, the evidence showed

that the parties negotiated the terms of their agreements, particularly as to quantity and pricing, every time Madelux placed an order from Barama. (*See, e.g.,* Exhibits 23, 24, 25, 26, 27, 28, 29, 30, 38, 41, 42). In one of the many communications between Revai and Richardson, Revai admits that Madelux's purchases from Barama "have disappeared," and that he understood that they could "restart" some orders if the price was right. (*See* Exhibit 20, fax dated June 21, 1999). This fax is further proof that Madelux was under no obligation to purchase plywood from Barama and that indeed did not purchase anything from Barama in quite some time.[3] In addition, Revai's statement that business relations could be "re-started" or resumed, is totally inconsistent with Madelux's position that they were the exclusive distributors for Barama in Puerto Rico.

Madelux and Barama often had difficulties agreeing on the pricing of the plywood. The parties' differences are evident from the e-mail communications of June 2000.[4] (*See* Exhibit 48, containing three e-mail messages.) Nonetheless throughout most of 2000, Madelux and Barama continued their business relationship without significant problems. In October of 2000, Revai wrote to Mr. Lalaram.[5] In this communication, Revai stated: "I am glad that the differences that may have existed regarding pending orders have been clari-

---

**3.** During the trial there was evidence that Madelux only placed one order from Barama during the year 1999. Plaintiff stated some reasons for this, namely, that Barama had managerial problems, strikes, and log shortages. In addition, Madelux's warehouse suffered significant damage as a result of Hurricane Georges in September of 1998.

**4.** Richardson informed Revai on June 22, 2000, of an upcoming price increase. Revai replied on June 23rd, by stating that he understood that they had agreed on the prices for the next two shipments. Thereafter, on June 24th, Richardson responded that there

were other customers, particularly in Venezuela, who were willing to pay higher prices for Barama's product. On June 26th Revai replied that he was very interested in discussing the issue of maintaining a long term relationship with Barama, and proceeded to place an order for Venezuela based upon the agreed prices. In this letter, Revai further states: "I believe that Madelux is probably the best option as a distributor in the markets we serve with warehouses and inventory." (Exhibit 63.)

**5.** Mr. Lalamar took over Mr. Richardson's responsibilities sometime in 2000.

fied between us." In addition, Revai stated: "... we need to know when will you ship our orders both to Puerto Rico and to Venezuela, because if you delay too long we need to produce additional volume from Brazil." (Exhibit 53, Oct 19, 2000.) In other words, if Barama could not produce the plywood, then Madelux would just get it from any other of their suppliers. As evidenced from the aforementioned communications, the parties' business dealing were inconsistent with those of a distributorship, given that neither Barama was bound to sell and/or provide any amount of plywood, nor Madelux obliged to make any purchase of plywood from Barama.[6] Rather, it seems that the parties entered into individual contracts every time an order was placed. Madelux had to negotiate terms dealing with pricing, quantity and type of wood every single time it wished to place an order with Barama. If the parties failed to reach an agreement as to the aforementioned terms, there was no obligation by either side to proceed.

Nevertheless, the Court finds that looking at the *Roberco* criteria to determine Madelux's status as a Law 75 dealer, puts the cart before the horse. This is so because "the 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." *Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.,* 23 F.3d 564, 569 (1st Cir.1994)(citing *General Office Products Corp. v. Gussco Mfg., Inc.,* 666 F.Supp. 328, 331 (D.P.R.

1987)); see also, *Caribe Industrial Systems v. National Starch and Chemical Co.,* 36 F.Supp.2d 448, 450 (D.P.R.1999). During the trial, Revai testified that he entered into a verbal gentlemen's agreement with Barama, and that the December 11, 1995 letter was a manifestation of said agreement. In fact, throughout this lawsuit, plaintiff Madelux has anchored its alleged Law 75 claim in the contents of the December 11, 1995 letter to Tomi Revai. The letter reads in its entirety:

> We wish to confirm that 'Madelux' and 'Castel' are the only buyers for our plywood in Puerto Rico. No other buyers are authorized to sell our plywood in the Puerto Rico market. All for your information and guidance. K.T. Chung, Managing Director.

(*See* Exhibit 2). The testimony presented at trial revealed that after receiving the aforementioned letter, Madelux proceeded to incorporate in Puerto Rico and purchased land to built a warehouse.[7] It is uncontroverted, however, that even though both Tomi Revai and Enrique Roldán had been doing business in Puerto Rico for quite some time, no efforts were ever made on their part to memorialize the specific terms of the "gentlemen's agreement." In fact, there is no evidence that Revai or Roldán ever objected to the unofficial and casual tone of the December 11, 1995 letter.

The lack of a 'formal' agreement, however, is not a "legal obstacle to a finding that [Madelux] is entitled to the protective cloak of Law 75." *Homedical Incorporat-*

---

**6.** In fact, when the parties were having problems with unfulfilled order in the year 2000, Revai e-mailed Lalaram asking him to let him know if Barama could or would ship additional orders to Madelux in Venezuela and Puerto Rico. In this e-mail Revai expressed his concern that Barama was not being accessible, but never suggested that Barama was obliged to Madelux under a distributorship agreement. (*See* Exhibit 56).

**7.** Enrique Roldán stated during his testimony that before Madelux built the warehouse they were functioning like a "broker." It should be noted, that during the trial there was no evidence presented as to what amount of the inventory stored in the warehouse came from Barama. The Court reasonably assumes that Madelux also utilized this warehouse facility to store wood purchased from their other suppliers in Brazil, Ecuador and Peru.

*ed v. Sarns/3M Health Care, Inc.*, 875 F.Supp. 947, 950 (D.P.R.1995)(citing *R.W. Intern. Corp. v. Welch Food, Inc.*, 13 F.3d 478 (1st Cir.1994)). Assuming, *arguendo*, that a relationship within the ambit of Law 75 existed between Madelux and Barama despite the lack of a formal agreement, the question still remains whether the relationship was 'exclusive' or 'non-exclusive.' The December 11, 1995 letter, does not contain the word 'exclusive' nor the word 'distributor.' It is axiomatic that the letter states that both Madelux and Castell were buying plywood from Barama. Therefore, the Court finds that the letter itself supports the finding that the parties' relationship was **non**-exclusive. In fact, Mr. Richardson testified that Barama did not grant exclusive distributorship agreements in the Caribbean region for policy reasons. A fax/letter mailed by Mr. Richardson on June 19, 1999, is further proof on the lack of 'exclusivity' in the relationship between Barama and Madelux. In said letter, Richardson stated, in relevant part: "Barama would like to keep our supply channels with Madelux. Other importers in Puerto Rico whom have expressed interest in Baromally Plywood have approached us. We have advised them that Madelux is currently our distributor and we are staying with that decision until further notice." (*See* Exhibit 19). Revai responded to the aforementioned communication on June 21, 1999, and never once mentioned his concern with other importers contacting Madelux, or the fact that Richardson referred to Madelux as a 'distributor' and not an 'exclusive distributor.' In fact, Revai's response is characterized by an apologetic tone, given that he was trying to justify the fact that Madelux ceased placing orders from Barama. (*See* Exhibit 20, Revai's letter of June 21, 1999). In view of the aforementioned, the Court finds that

the parties' relationship was **non**-exclusive in nature.

 Law 75 does not "operate to convert non-exclusive distribution contracts into exclusive distributions contracts." *Borschow Hospital and Medical Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 14 (1st Cir.1996)(internal citations omitted); see also, *Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*, 23 F.3d at 569. "The law imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so." *Twin County Grocers, Inc. v. Mendez and Co., Inc.*, 81 F.Supp.2d 276, 285 (D.P.R.1999)(citing *General Office Products v. Gussco Manufacturing, Inc.*, 666 F.Supp. 328, 331 (D.P.R.1987)). Madelux argued during the trial that Barama breached the Law 75 exclusive agreement between them when it sold plywood to Aljoma, Maldeux's competitor, in 2001. The Court disagrees. "Law 75 protects supplier-distributor relationships, but does not pamper distributors into acquiring rights that they have never possessed to begin with." *Caribe Industrial Systems v. National Starch and Chemical Co.*, 36 F.Supp.2d at 452. Madelux never had the 'exclusivity' to distribute Barama's plywood in Puerto Rico. Assuming, without deciding, that the December 11, 1995 letter constituted a **non**-exclusive distributorship agreement, said agreement would have allowed Barama to sell to Aljoma, as it was **non**-exclusive in nature.

### CONCLUSION

After reviewing all the evidence presented at trial and the pertinent law dealing with Law 75, the Court finds that Madelux and Barama did not have an exclusive "distributorship agreement" under Law 75, and as such cannot be afforded any remedy under said law.[8]

---

**8.** It should be noted that Madelux did not bring a breach of contract claim (for the

unfulfilled orders of 2000–01), nor did it al-

The Court will not grant Barama damages under its alleged counterclaim against Madelux for tortious interference with commerce in violation of Article 1802 of the Puerto Rico civil code, since Barama did not submit a scintilla of evidence during the bench trial in support of this claim. Judgment will be issued accordingly.

**IT IS SO ORDERED.**

lege that the failure to fulfill said orders, was detrimental to the distribution relationship. See, e.g., *Irvine, IRG Research Group, Inc. v. Murad Skin Research Laboratories, Inc.*, 194 F.3d 313, 317–18 (1st Cir.1999). In addition, Madelux did not bring claims under Law 21 (Puerto Rico's Sales Representative Act of 1990, 10 P.R. Laws Ann § 279).