CARIBBEAN WHOLESALES & SERVICE CORP., Plaintiff,

v.

U.S. JVC CORP., Defendant.

U.S. JVC CORP., Plaintiff,

v.

CARIBBEAN WHOLESALES & SERVICE CORP., Defendant.

Nos. 93 Civ. 8197 (PKL), 93 Civ. 4853 (PKL).

United States District Court, S.D. New York.

May 12, 1997.

Law Offices of Norman L. Faber, New York City (Norman L. Faber, of counsel), Woods & Woods, Hato Rey, PR (Harry Woods, of counsel), for Plaintiff Caribbean Wholesales & Service Corp.

Golenbock, Eiseman, Assor & Bell, New York City (Richard S. Taffet, of counsel), for Defendant U.S. JVC Corp.

### OPINION AND ORDER

LEISURE, District Judge.

In the above-captioned, consolidated actions, plaintiff Caribbean Wholesales and Service Corporation ("CWS") sues defendant U.S. JVC Corporation ("JVC") under Puerto Rico's Dealer's Contracts Act (commonly known as "Law 75"), P.R. Laws Ann. tit. 10, § 278 et seq. (1994), and JVC asserts breach of contract claims against CWS. CWS brought its action in the Superior Court of Puerto Rico, and the action was removed to the District Court of Puerto Rico and subsequently transferred to this Court. See Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., Civil No. 93–2053(HL), op. at 2, 12 (Nov. 15, 1993). JVC brought its contract action in this Court, and the claims were consolidated with CWS's action as counterclaims. Before the Court are JVC's motion for summary judgment and CWS's cross-motion for partial summary judgment. For the reasons stated below, the motion and the cross-motion are respectively granted in part and denied in part.

### BACKGROUND

CWS is a Puerto Rico corporation based in Bayamon, Puerto Rico and is an importer, distributor, and wholesaler of products in Puerto Rico. JVC is a New York corporation with headquarters in New Jersey, which manufactures and sells consumer electronic products in the United States and its territories. In September of 1981, CWS and JVC entered a distribution agreement (with its annual renewal agreements, collectively the "Agreement") whereby CWS became a wholesale distributor of JVC's products, including video and audio electronics.[1] The Agreement contained a forum selection clause designating New York as the forum for "all actions, suits or proceedings between JVC and [CWS] arising out of, in connection with or relating to this Agreement." E.g, Taffet Aff. Ex. 17 ¶ 16. The original Agreement by its terms had a duration of one year, from October 1, 1981 until September 30, 1982, but was renewed annually until 1993, when JVC formally terminated the distribution relationship. Each year, a schedule attached to the renewed distribution agreement stated the minimum purchase requirements ("MPRs") obligating CWS to buy certain amounts of specified JVC product types during that contract period.

One of the JVC customers developed by CWS was a retailer known as BWAC, which started buying products through CWS in 1987, and which soon grew to be CWS's most important account. However, in October of 1989, M.L. Daniel, an employee at BWAC's then-parent company Transamerica, sent a memorandum to William Winders, BWAC's buyer, instructing him that "[d]ue to pricing,"

---

**1.** Although the contract makes CWS a non-exclusive distributor, no other JVC distributor was ever established in Puerto Rico.

BWAC should stop buying from CWS and instead "join a buying group" to obtain JVC and Magnavox products. On January 1, 1990, Gabriel Villani became BWAC's Executive Vice President, and he, along with Daniel (to whom Villani reported), decided to stop buying JVC products through CWS and to seek a buying group that would suit BWAC's needs.[2] By March of 1990, CWS's sales of JVC product to BWAC had declined significantly, and in about June of 1990, BWAC informed CWS that it would begin buying through a mainland buying group called MARTA Cooperative of America, Inc. ("MARTA").[3]

BWAC obtained JVC video products, which it had previously bought from CWS, through MARTA. JVC audio products, which BWAC had also bought through CWS,[4] were not available through the buying group. Starting apparently in the summer of 1990,[5] JVC arranged to sell audio merchandise directly to BWAC. CWS contends that JVC's prices to BWAC were lower than those to CWS for the same audio merchandise. This assertion is based upon a comparative summary of prices, listing prices charged to CWS and to BWAC, as calculated from invoices. The summary applies a 2% discount for early payment and an additional 10% discount to the BWAC invoices. See Reyes Jr. Aff. Ex. 23 n. 2. The term "2% 25 net 30" appears on the invoices, thus supporting the application of a 2% discount upon the assumption that invoices would be paid within 25 days. However, each invoice's net total already reflects a 10% deduction, and the Court can find no basis for CWS's calculation of an additional 10% discount.[6] Applying the 2% discount alone, the prices charged to BWAC are slightly *higher* than those charged to CWS.

Effective October 1, 1990 the parties entered an amendment (the "Amendment") to the distribution agreements, providing for a 2% commission on all JVC sales to BWAC through MARTA until March 31, 1991, in exchange for CWS's support services to BWAC.[7] The Amendment was made expressly in recognition of the fact that BWAC was participating in MARTA, and was arrived at after several months of negotiations over the amount of commissions and other terms. It is undisputed that, at no time during the

---

2. According to Villani, the criteria included price, diversifying BWAC's product line, and administrative convenience.

3. The motivations for BWAC's decision to stop buying from CWS and to buy instead through MARTA are disputed. CWS contends that the fact that JVC made lower prices available to BWAC through the MARTA group was BWAC's sole reason. In CWS's view, JVC went behind CWS's back and induced BWAC to leave CWS, by promising lower pricing through MARTA. JVC counters that CWS presents no evidence of any discussion between BWAC and JVC prior to BWAC's announcement of its decision to buy through MARTA. Instead, JVC contends, Winders had been receiving kickbacks from CWS, and BWAC decided not to deal with CWS because of this unethical conduct. Winders denies receiving kickbacks, and CWS points to JVC's lack of evidence to support this charge.

4. BWAC's purchases of JVC audio products from CWS represented about 60% of its total purchases of JVC merchandise in 1989.

5. The exact date when negotiations for direct sales of audio product commenced is unclear. JVC only states that sales—either through MARTA or directly, the brief does not clarify—"commenced in November 1990." Def.'s Mem. Law

at 27. CWS asserts that "in the summer of 1990," JVC and BWAC met to discuss direct sales of audio product. Pl.'s Mem. Law Opp'n at 13 (citing Bengochea Aff. ¶ 9; Faber Aff. Ex. 5 pt. II at 84–88; Faber Aff. Ex. 10 at 136–38). Unfortunately, none of the evidence cited by CWS establishes the date of any meeting that may have occurred.

6. Even applying CWS's formula, the Court's calculations do not reach the same prices as those listed in the summary.

7. The Amendment states that CWS was to provide marketing support services—such as supplying catalogues and displays—but it is apparently undisputed that CWS's consideration in exchange for the commissions was to provide warranty service. See Def.'s Statement Pursuant to Local Civil Rule 3(g) ¶ 37 [hereinafter · Def.'s 3(g)] (describing the Amendment as requiring CWS to "provide warranty service for JVC products purchased by BWAC through MARTA"); Pl.'s Statement of Disputed Material Facts Pursuant to Rule 3(g) ¶ 37, at 14–15 [hereinafter Pl.'s 3(g)] (disputing other aspects of JVC's ¶ 37); *see also* Local Civil Rule 3(g) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

negotiation, was the expiration date of the Amendment an issue of contention. However, when JVC stated, in a letter to CWS dated March 21, 1991, that the Amendment was due to expire at the end of the month, CWS responded with some surprise, stating its understanding that the Amendment was intended to be renewed along with the body of the distribution agreement. Nevertheless, JVC did not make commission payments as to any sales occurring after March 31, 1991.

During the same years, JVC began expressing concerns about CWS's payments on its account. Although not obligated to do so by the Agreement,[8] JVC had, since 1984, offered CWS payment terms of "3% 30 net 60"—in other words, payment would be due within 60 days of the invoice date, but if CWS paid within 30 days, it would receive a 3% discount. In 1989 and 1990, CWS on a number of occasions failed to take advantage of the 3% discount term. Further, in May of 1990, CWS's account became past due.[9] JVC's concerns regarding the account were repeatedly expressed to CWS. In the summer of 1990, JVC informed CWS that it would no longer sell to CWS on open account. In October of 1990, CWS entered a "floor plan" financing arrangement with Chrysler First Credit Corporation (with its successor, collectively "Chrysler"),[10] whereby any order from JVC would not be shipped until Chrysler approved the order. As long as CWS was not delinquent on its payments and was not in default as to its obligations to

disclose certain financial information to Chrysler, the orders would be approved. Chrysler gave CWS terms of 90 days for payment (longer than JVC offered but with no discount for early payment), and gave CWS a credit line of $1.5 million (an increase over the $650,000 credit line extended by JVC).

JVC contends that CWS's financial condition and its ability to market JVC products effectively were adversely impacted by the creation of several companies affiliated[11] with CWS. It is undisputed that CWS's principals started two companies: Supreme Electronic Distributors, Inc. ("Supreme"), formed in 1986, and H & H Sales, Inc. ("H & H"), formed in 1990. These companies became distributors of consumer electronics products manufactured by JVC's competitors. In addition, CWS's principals formed H.R. & Associates ("H.R.") in 1989, which bought and developed real estate for CWS's warehouse and office facilities. The parties dispute the extent of financial dealings among the companies, but it appears to be undisputed that CWS occasionally made intercompany loans to Supreme, H & H, and H.R., and paid some employees' salaries and certain other expenses for the other companies. JVC contends that CWS's support of the affiliated companies caused financial problems for CWS that affected its ability to pay JVC in a timely manner.[12] CWS contends that the intercompany loans did not interfere with CWS's ability to pay JVC,[13] and that the

---

**8.** Paragraph 4 in each Agreement states that "[n]either this Agreement nor any terms or conditions of sale established by JVC will require JVC to sell upon open account, and any such sales will be in the sole discretion of JVC." *E.g.*, Taffet Aff. Ex. 15 ¶ 4.

**9.** CWS contends that its overall pattern of invoice payment did not change, and that its accounts therefore did not reflect a greater risk of delinquency in 1990 as compared to any other period of the distribution relationship.

**10.** JVC states that CWS entered this arrangement upon JVC's recommendation. CWS contends that the arrangement was forced upon it by JVC, under threat of losing the distribution contract altogether. *See* Pl.'s Mem. Law Opp'n at 18. However, the question of CWS's degree of willingness to enter this arrangement is not relevant to the Law 75 considerations at issue in the case.

**11.** Although CWS apparently takes issue with this characterization of the companies, *see, e.g.*, Pl.'s Mem. Law Opp'n at 7, the term is borrowed from CWS's financial statements, *see, e.g.*, Taffet Aff. Ex. 28 at 3, and is used for the sake of brevity.

**12.** JVC's evidence shows the balances owed by the affiliated companies to CWS at the close of the fiscal years ending 1988 to 1993. The balances increased from $356,081 on June 30, 1988 to $1,508,855 on June 30, 1993.

**13.** CWS explains that although each credit balance cited by JVC represents the intercompany indebtedness at the year's end, the figures do not accurately reflect the pattern of advances to and repayments by the affiliated companies, because their revolving credit arrangement meant that loan balances changed regularly. CWS also points out that in fiscal year 1992–93, Supreme

relations between the companies did not affect CWS's marketing of JVC products.

Starting apparently in about April of 1992,[14] CWS's account with Chrysler was delinquent on a number of payments, and, in a letter dated June 30, 1992, Chrysler informed CWS that "no approvals of inventory orders will be granted until we receive current payments totalling $110,740.18" along with copies of certain financial statements required to be disclosed under the "floor plan" agreement. Gentry Aff. Ex. A. CWS did not cure the delinquencies, and no JVC orders were approved thereafter.

During about the same period, a dispute arose regarding the renewal Agreement covering the contract period from October 1, 1991 until September 30, 1992. The Agreement for that contract period was sent to CWS in September or October of 1991, and, unlike the standard printed form Agreements covering the contract periods from 1983–84 until 1990–91, was a typed contract. Although in other respects identical to the previous annual Agreements, the proposed 1991–92 contract (the "Proposed Contract") contained a general release clause providing that:

> In consideration of the mutual promises contained herein and other valuable consideration the undersigned DISTRIBUTOR on its own behalf and on behalf of its executors, administrators, successors and assigns, hereby releases JVC, its agents, affiliates and/or subsidiaries from any and

all liability of every nature whatsoever that it ever had or now may have from the beginning of the world to the date of this Agreement.

Reyes Jr. Aff. Ex. 47 ¶ 11(d). The Proposed Contract arrived without an explanation of the new provision.[15]

CWS did not execute the Proposed Contract at that time,[16] and in November of 1991, JVC noted that it had not received the renewal and sent another copy of it to CWS. By a letter dated November 27, 1991, CWS informed JVC that "due to certain problems experienced by (sic) JVC contractual relationship with BWAC, I have requested my legal counsel an opinion [sic] as to the extent and consequences of this agreement." Reyes Jr. Aff. Ex. 49. Four and a half months later, by a letter dated March 12, 1992, CWS's counsel proposed that CWS and JVC meet to discuss the Proposed Contract, "BWAC's situation and the future of the relationship between CWS and JVC." Taffet Aff. 69 at 1. Several weeks later, in a letter dated April 6, 1992, JVC's general counsel wrote to CWS that "we can not [sic] and will not ship additional merchandise unless we have a signed agreement from you." [17] Reyes Jr. Aff. Ex. 50.

The parties met on April 24, 1992, and at that meeting, CWS specifically expressed its objection to the general release clause. JVC agreed to delete the paragraph, although it is not clear when this happened.[18] The offend-

and H & H advanced nearly $300,000 total *to* CWS to provide CWS working capital for its promotion and servicing of JVC products.

**14.** In its brief, JVC states without citation to the record that the problem started in October of 1991. It may be that JVC is relying on deposition testimony of CWS's founder and president, Hector Reyes Rivera, *see* Def.'s Mem. Law at 16 (citing Taffet Aff. Ex. 1 vol. VI at 3–5), but that testimony only establishes that Reyes thought, but did not remember with precision, that the problem arose about a year after entering the "floor plan." By contrast, Greg Gentry, an Account Administrator at Chrysler with first-hand knowledge of the events, states affirmatively in his affidavit that "[p]roblems in the nature of late payments started to arise ... in approximately April 1992." Gentry Aff. ¶ 3.

**15.** Law 75 itself declares that "the provisions of this chapter are of a public order and therefore

the rights determined by such provisions cannot be waived." P.R. Laws Ann. tit. 10, § 278c (1994). Thus, it is not clear what effect the paragraph would have had, had the Proposed Contract been accepted.

**16.** In November of 1991, CWS did execute the MPR schedule covering that contract period.

**17.** It is undisputed that it was JVC's policy not to ship product to a distributor without an executed distribution agreement. *See* Def.'s 3(g) ¶ 63; Pl.'s 3(g) at 18 (omitting JVC's ¶ 63 from CWS's list of JVC's contentions disputed by CWS).

**18.** JVC contends, without citing evidence to support its account of the timing of events, that it agreed to delete ¶ 11(d) as soon as the issue was raised at the April 24, 1992 meeting. *But see* Reyes Jr. Aff. ¶ 75 ("Although Caribbean was given the opportunity at the meeting to air its

ing paragraph was removed, and the renewal Agreement (without a general release clause) for the 1991–92 contract period was executed by CWS on June 10, 1992. Due to the lapse of the Agreement, however, JVC had withheld shipments of merchandise to CWS from April until June of 1992.[19] CWS alleges that, as a result of JVC's refusals to ship, CWS had to cancel a prepaid promotional campaigns and a number of dealer orders due to lack of inventory.

In November of 1992, despite the continued delinquency of CWS's "floor plan" account and Chrysler's continued refusal to approve orders, JVC and CWS entered an Agreement renewing the distribution relationship for the period from October 1, 1992 until September 30, 1993. The MPR schedule for that contract period was maintained at the levels set in the previous year.[20] JVC alleges that CWS failed to meet the sales quota during this contract period.

Finally, in March of 1993, CWS brought the instant action in Puerto Rico Superior Court, alleging violations of Law 75. Meanwhile, Chrysler had continued since June 30, 1992 to refuse to approve CWS's credit purchases of JVC products, based on the continued delinquency of CWS's account. From April to July of 1993, Chrysler and CWS attempted to arrange a work-out of the account. In settlement of the debt, CWS paid $12,500 in cash and on July 27, 1993, released almost all its remaining JVC inventory, valued at slightly over $110,000, to Chrysler. All of the merchandise was over a year old. At about the same time, JVC removed CWS's Puerto Rico lawsuit to federal court

in the District of Puerto Rico, and instituted its breach of contract action in this Court by filing its complaint on July 26, 1993. JVC subsequently terminated the distribution relationship formally by sending notice, dated July 28, 1993, that the Agreement would be terminated effective August 7, 1993.

CWS states claims under Law 75, alleging that JVC impaired the existing distribution relationship by: (1) selling products directly to BWAC; (2) failing to renew the Amendment providing for commissions on JVC's sales to BWAC through MARTA; (3) ending its practice of selling to CWS on open account; (4) suspending shipments of products, starting in April of 1992; and (5) imposing unreasonable MPRs. In addition, CWS claims that JVC violated Law 75 by formally terminating the Agreement in 1993 without just cause. JVC counterclaims that CWS breached the Agreement by: (1) failing to fulfill the MPRs set for the 1992–93 contract period; and (2) bringing the Law 75 action in Puerto Rico Superior Court in contravention of the contract term designating New York as the forum for disputes arising under the Agreement. JVC moves for summary judgment as to the Law 75 claims, and CWS cross-moves for summary judgment as to the contract claims.

## DISCUSSION

■ Puerto Rico's Law 75 was enacted to protect local businesses from what were perceived as abusive and arbitrary practices by larger, primarily mainland-based corporations seeking to market their products

grievances, *nothing* substantive resulted."). It is also unclear exactly when the 1991–92 Agreement, with the offending clause removed, was offered to CWS for execution.

19. It is not clear exactly when the shipment stoppages relating to the lack of a signed Agreement began. The complaint alleges damages resulting from stoppages "[c]ommencing in or around April or May of 1992." Am. & Supplemental Compl. ¶ 13(c). Defendant's brief states that shipments were withheld beginning in April of 1992, and plaintiff's opposing brief only states that "commencing in 1992 JVC did not ship." Pl.'s Mem. Law Opp'n at 20. However, deposition testimony provided by a CWS officer indicates that some shipments were released some time in April of 1992. *See* Taffet Reply Aff. Ex. A

vol. IV at 76. With regard to the end date of the shipment stoppages related to this claim, it appears to be undisputed that, in June, "[a]fter Caribbean signed the distributor agreement with the deletion of the release, shipments resumed to the extent Caribbean could arrange to pay for them." Reyes Jr. Aff. ¶ 77.

20. CWS states in its brief, without citation to evidence in the record, that the MPRs set in the 1992–93 renewal rider "were increased over the 1991–92 levels." Pl.'s Mem. Law Opp'n at 38. The Court can find no support for this contention. The MPR schedule set forth in the renewal rider, *see* Taffet Aff. Ex. 26, lists the same terms as the schedule attached to the 1991–92 Agreement, *see* Taffet Aff. Ex. 25.

through Puerto Rico distributorships. *See R.W. Int'l Corp. v. Welch Foods, Inc.,* 88 F.3d 49, 51 (1st Cir.1996) (citing *Vulcan Tools of P.R. v. Makita, U.S.A., Inc.,* 23 F.3d 564, 568 (1st Cir.1994)). Such a corporation, with its superior bargaining position, could in the absence of Law 75's protections terminate a local dealer's distribution contract once the dealer had created a market for the supplier's goods. The Puerto Rico legislature, believing that traditional contract law principles offered inadequate protection in the context of this imbalance of bargaining power, created Law 75 to prevent such abuses. *See id.*

Law 75 "provides that, notwithstanding any contractual provision to the contrary, the supplier in a distribution contract may terminate a dealership only for 'just cause.'" *Homedical, Inc. v. Sarns/3M Health Care. Inc.,* 875 F.Supp. 947, 949 (D.P.R.1995). Thus, even when a dealer's contract by its express terms expires on a given date, the supplier may not "refuse to renew said contract on it normal expiration, except for just cause." P.R. Laws Ann. tit. 10, § 278a (1994). "Just cause" is statutorily defined as "nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor [that is, the supplier,] in promoting the marketing or distribution" of its products. *Id.* § 278(d).

One court has summarized that cases interpreting Law 75 have found "just cause" to exist in any one of the following situations:

(1) when a dealer used the principal's trademarks of products for unfair competition and without authority.

(2) when a dealer assigned its contractual rights to a competitor of the principal.

(3) when a dealer had limited sales, did not operate its own service organization and did not keep adequate inventory.

(4) when a dealer consistently violated the established payment terms.

*An–Port, Inc. v. MBR Indus., Inc.,* 772 F.Supp. 1301, 1314 (D.P.R.1991) (citations omitted) (citing, *inter alia, Jordan K. Rand, Ltd. v. Lazoff Bros.,* 537 F.Supp. 587 (D.P.R. 1982); *Pan Am. Computer Corp. v. Data*

*General Corp.,* 652 F.2d 215 (1st Cir.1981); *Luis Rosario, Inc. v. Amana Refrigeration, Inc.,* 733 F.2d 172 (1st Cir.1972); *PPM Chemical Corp. v. Saskatoon Chemical, Ltd.,* 931 F.2d 138 (1st Cir.1991)). The *An–Port* decision also recognized that a dealer's contract, like any other contract under "the general requirements of the system of law in Puerto Rico," imposes upon the dealer a requirement of good faith, because "[d]istribution contracts in themselves are characterized for their continuity, stability and *mutual trust." Id.*

■ In addition to prohibiting non-renewal of a contract without just cause, Law 75 also prohibits a supplier from directly or indirectly performing "any act detrimental to the established relationship" with the distributor, except "for just cause." P.R. Laws Ann. tit. 10, § 278a (1994). Law 75 creates a rebuttable presumption of impairment of an existing distribution relationship, in any of the following scenarios:

(1) When the principal or grantor establishes facilities in Puerto Rico for the direct distribution of merchandise . . . ;

(2) when the principal or grantor establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico or any part of said area in conflict with the contract existing between the parties;

(3) when the principal or grantor unjustifiably refuses or fails to fill the order for merchandise sent to him by the dealer in reasonable amounts and within a reasonable time;

(4) when the principal or grantor unilaterally and in an unreasonable manner varies the shipping methods or the manner, conditions or terms of payment for the merchandise ordered, to the prejudice of the dealer.

*Id.* § 278a–1(b). Once a dealer has established the non-renewal or impairment of an existing distribution relationship, it is the supplier's burden to demonstrate that it had just cause. *See Draft–Line Corp. v. Hon Co.,* 781 F.Supp. 841, 844 (D.P.R.1991), *aff'd mem.,* 983 F.2d 1046 (1993).

The well-known formula for determination of a summary judgment motion directs that, to grant summary judgment, the Court must find that the competent evidence discloses no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that no genuine issue of fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). The court's function is not to weigh the evidence and determine the truth of the matter, but rather to ascertain whether a genuine issue exists to be tried. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

In assessing the record to determine whether there is a genuine issue as to any material fact, the nonmovant's evidence is to be credited, and all reasonable inferences are to be drawn in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *LaFond,* 50 F.3d at 171. However, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)) (internal quotation marks and citations omitted).

With respect to issues as to which the nonmovant would bear the burden of proof at trial, the moving party can satisfy its burden in one of two ways: (1) if it presents competent affirmative evidence negating an essential element of the nonmoving party's claim; or (2) if it can point to a "complete failure of proof" concerning an essential element of the nonmoving party's claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). However, "[w]here the moving party bears the burden of proof at trial, the motion must be supported by credible evidence 'that would entitle it to a directed verdict if not uncontroverted at trial.'" *Draft–Line,* 781 F.Supp. at 843 (quoting *Celotex,* 477 U.S. at 331, 106 S.Ct. at 2556–57).

## I. Loss of the BWAC Account

First, JVC seeks summary judgment with respect to CWS's claim that the loss of the BWAC account, and JVC's subsequent direct sales to BWAC, constitute a violation of Law 75. CWS asserts that JVC impaired the existing distribution relationship by causing BWAC to stop purchasing JVC products through CWS and to start buying through the MARTA buying group and, in the case of JVC audio products, directly from JVC. CWS argues that JVC's conduct must be presumed to have caused an impairment under section 278a–1(b)(1), which states that, in the absence of contrary evidence, an impairment occurs "when a principal or grantor establishes facilities in Puerto Rico for the direct distribution of merchandise." JVC contends that BWAC independently decided to stop purchasing JVC products from CWS, and thus no direct or indirect action by JVC caused any detriment to CWS. With respect to BWAC's participation in MARTA, and hence its decision to stop buying from CWS the JVC products it could obtain through MARTA, the lack of evidence that JVC "directly or indirectly perform(ed) any act" that induced BWAC's decision compels this Court to grant JVC's motion. However, with respect to JVC's direct sales of audio products to BWAC, triable issues of fact remain, precluding summary judgment.

### A. BWAC's Participation in MARTA

■ As early as October of 1989, BWAC expressed internally its dissatisfaction with the prices of JVC products bought from CWS, and sought to explore participation in a dealers' buying group. Daniel wrote to BWAC's buyer that "we should curtail our buying from these people," but that if BWAC "must have JVC and Magnavox [products] to survive," it should "join a buying group and get it for the right price." Taffet Aff. Ex. 40.

Thus, BWAC contemplated dropping the JVC line altogether in conjunction with curtailing its CWS purchasing. Moreover, Villani, the BWAC officer who made the final decision to stop buying from CWS, testifies in his deposition that no vendor told him that BWAC should join a buying group, and that he did not discuss with JVC the decision to leave CWS and join MARTA until after BWAC had actually joined MARTA.[21] *See* Taffet Aff. Ex. 7 at 17, 20. There is no evidence that BWAC's decision was induced or influenced by any communication or other affirmative act on JVC's part. Villani and Daniel seem simply to have decided that the prices BWAC was paying were too high, and that other sources should be sought.[22] *See id.* at 12, 14–15.

■ Thus, as far as JVC having influenced BWAC's decision to join MARTA, the most that can be said is that JVC did not change its price structure in such a manner that CWS would be able to retain BWAC as its customer. Nothing in Law 75 or the cases applying it suggests that a supplier is required to determine its pricing, including volume discounts offered to buying cooperatives like MARTA, in such a way that its non-exclusive Puerto Rico dealer is always able to offer the best prices for the Puerto Rico region.[23] Consistent with this reading of

Law 75 is the language in section 278a–1(b)(1) that an impairment by direct sales is rebuttably presumed when a supplier "*establishes facilities* in Puerto Rico." BWAC's decision to join MARTA, which was based in Chicago, Illinois, can hardly be said to constitute a creation of facilities by JVC in Puerto Rico for direct distribution. JVC has carried its burden on its motion for summary judgment by pointing to the absence of competent evidence to support an essential element of the claim—an action by JVC which could reasonably be found to have caused the detriment. Accordingly, summary judgment is granted as to the claim based on BWAC's participation in MARTA.

**B. *JVC's Direct Sales of Audio Products to JVC***

■ JVC contends that its direct sales of audio merchandise to BWAC similarly cannot be attributed to any action by JVC because such sales did not start until several months after Villani decided that BWAC would no longer buy JVC products from CWS. Because of the rebuttable presumption that a relationship is impaired when the supplier "establishes facilities in Puerto Rico for the direct distribution of merchandise," P.R. Laws Ann. tit. 10, § 278a–1(b)(1), JVC bears a rigorous burden of proof at the summary judgment stage. *See Draft–Line Corp.,* 781

---

**21.** The conjecture offered by CWS, to the effect that "it appears that JVC and BWAC spoke regarding the availability of JVC product through the MARTA program prior to the time that Caribbean was advised by JVC that BWAC had joined MARTA," Pl.'s Mem. Law Opp'n at 13 (citing Reyes Jr. Aff. ¶ 46), is too speculative and vague to defeat summary judgment as to this claim. *See Western World Ins. Co.,* 922 F.2d at 121. CWS fails to offer competent evidence to counter Villani's affirmative statement that he alone, in consultation with Daniel, made the decision to join a buying group. For example, one affiant states that "it is clear to me that JVC and BWAC must have spoken regarding the MARTA program." Reyes Jr. Aff. ¶ 46. The statement reflects pure speculation. An affidavit must be based upon personal knowledge of the facts to comply with Rule 56(e) of the Federal Rules of Civil Procedure.

**22.** The only other factors that appear to have influenced BWAC's decision to join MARTA were the diversity of products and administrative ease of purchasing through a buying group. *See id.* at 15.

**23.** It is true that in *General Office Prods. v. Gussco Mfg.,* 666 F.Supp. 328, 331 (D.P.R.1987), the court found that a supplier's failure to prevent a mainland distributor from entering the Puerto Rico market violated "the impairment-of-contract cause of action." However, this result was mandated only because an exclusive distributorship "implies not authorizing *other distributors for the same area*" and "*abstaining from selling directly to other commercial outlets in the region.*" *Id.* at 332–33 (quoting ABA Antitrust Section, Monograph No. 9, *Refusal to Deal and Exclusive Distributorship* (1983)) (emphasis in *General Office Prods.*) (internal quotation marks omitted). Thus, the supplier's inaction was "in contravention of a voluntarily-established exclusive contract." In the case at bar, CWS did not have an exclusive distribution contract, and therefore JVC was under no obligation to prevent BWAC from obtaining products through MARTA or to prevent MARTA from allowing buyers like BWAC to join.

F.Supp. at 844. The Court finds that JVC has not carried this burden. The direct sales to BWAC stand on a different footing than the sales through MARTA, because there is evidence in the record that could reasonably lead a jury to infer that JVC performed acts that directly or indirectly caused BWAC to decide not to resume purchasing from CWS once it learned that JVC audio products could not be obtained from MARTA.

Based on the record presented, a jury could find that, although BWAC independently decided to participate in MARTA, when it later learned that JVC audio products were not available through MARTA, it would have decided to resume buying such merchandise from CWS, had not JVC offered advantageous terms.[24] *See* Bengochea Aff. ¶ 10. In reaching the decision to buy through MARTA, BWAC determined—without discussing the matter with JVC—that the pricing (as well as other advantages) it could obtain through that program made it worthwhile to join. *See* Taffet Aff. Ex. 7 at 17, 20. In contrast, before commencing direct purchases of audio products from JVC, BWAC had to negotiate with JVC the prices and other terms it would receive. *See* Faber Aff. Ex. 16 at 66. On the basis of the evidence presented, a jury could conclude that JVC's participation in such negotiations constituted an action directly or indirectly contributing to the establishment of facilities for direct distribution in Puerto Rico.[25] Accordingly, triable issues of fact remain as to CWS's claim regarding the loss of sales of audio merchandise to BWAC, and summary judgment with respect to this claim must be denied.

## II. *Non–Renewal of the Amendment Providing for Commissions*

Second, JVC contends that the Court should grant summary judgment as to CWS's claim based on JVC's failure to continue commissions payments on its sales to BWAC. CWS claims that JVC violated Law 75 by failing to continue to pay commissions under the October 1, 1990 Amendment, which provided that JVC was to pay a 2% commission to CWS for net MARTA sales to BWAC, through and including March 31, 1991. *See* Taffet Aff. Ex. 53. CWS argues that JVC's failure to renew the Amendment without just cause is a violation of Law 75. JVC argues that because the Amendment on its face expired on March 31, 1990, CWS could not expect to receive commissions after that date, and JVC had no obligation to renew the commissions agreement.

■ Initially, it should be observed that the Amendment itself does not, standing alone, establish a dealer/supplier relationship. Although section 278(d) defines a "dealer's contract" to include an arrangement whereby a dealer "takes charge of the ... rendering of a service," the services to be performed by CWS under the Amendment do not establish a dealership. Cases interpreting Law 75 have identified eight activities relied upon to ascertain dealership status, in general terms: transportation of goods or services from the principal to cus-

24. As previously discussed, *see supra* note 6 and accompanying text, the evidence appears to show that JVC's prices to BWAC on audio merchandise were slightly higher than the prices charged to CWS. However, presuming that CWS added a mark-up to cover overhead and profit, then obviously the distributor's mark-up could make CWS's price to BWAC higher than JVC's direct price to BWAC. Villani confirms that he negotiated prices with JVC that were better than those offered by CWS. *See* Faber Aff. Ex. 16 at 66.

25. JVC argues that it had a non-exclusive distribution contract with CWS, and therefore CWS cannot complain of the sales to BWAC. JVC's argument is unavailing because the issue is not the creation of other distributorships, but direct sales to BWAC. *Compare* P.R. Laws Ann. tit. 10, § 278a–1(b)(1) (relating to direct distribution) with *id.* § 278a–1(b)(2) (relating to the creation of additional dealerships). In regard to this distinction, JVC relies on *Homedical*, 875 F.Supp. at 951, for the contention that direct sales are equivalent to the creation of additional dealerships under Law 75, and thus a non-exclusive dealer cannot complain of either action. This proposition rests upon a strained reading of *Homedical.* In that case, the court merely found that evidence of direct sales to "a few consumers" was not enough evidence to rule that, as a matter of law, the relationship under scrutiny was a non-exclusive dealership. *Id.* The holding hardly compels a ruling that direct sales cannot be an impairment of a non-exclusive dealership. Moreover, such a ruling would imply that section 278a–1(b)(1) is mere surplusage because section 278a–1(b)(2) would address the same conduct.

tomers or intermediaries, publicity, market coordination, merchandise delivery, collections, maintenance of inventory, promotion, and execution of sales contracts. *See A.M. Capens Co. v. American Trading & Prod. Corp.*, 892 F.Supp. 36, 39 (D.P.R.1995).

The lack of a few of the eight main functions would not be fatal to a claim of dealer status. *See id.* at 40 (citing *Roberco, Inc. v. Colón v. Oxford Indus.*, 122 P.R. Dec. 115 (1988)). However, in this case, too many of the activities are missing. *See generally San Juan Mercantile Corp. v. Canadian Transp. Co.*, 108 P.R. Dec. 211 (1978), *translated in* 8 P.R. Offic. Trans. 218 (1978) (emphasizing the importance of the last two factors). CWS's services under the Amendment do not include publicity, market coordination, delivery, collection, keeping inventory, promotion, or sales. Because the Amendment itself is not a dealer's contract, JVC's failure to renew the Amendment alone is not a violation of section 278a's second provision, that a supplier "may not ... refuse to renew said contract on its normal expiration" without just cause. Rather, CWS must rely on the first portion of section 278a, the "impairment-of-contract cause of action." *General Office Prods.*, 666 F.Supp. at 331.

■ Although not itself a dealer's contract, the Amendment forms *part* of the overall distribution relationship as established by the Agreement. It is an amendment to the Agreement and incorporates the Agreement by reference. Thus, CWS argues that JVC, by not continuing the commissions arrangement, performed an "act detrimental to the established relationship." P.R. Laws Ann. tit. 10, § 278a (1994). This portion of Law 75

was added by a 1966 amendment to the statute, and "was intended to cover cases where the principal impairs the distributor's contractually acquired rights." *Vulcan Tools*, 23 F.3d at 568 (citing *General Office Prods.*, 666 F.Supp. at 331). Accordingly, the provision "only protects against detriments to contractually acquired rights," and the " 'established relationship' between dealer and principal is bounded by the distribution agreement." [26] *Id.* at 569 (holding that the dealer's "established relationship" with the supplier encompassed its status as a non-exclusive dealer, and thus that the creation of additional dealerships was not an impairment); *see also J. Soler Motors v. Kaiser Jeep Int'l*, 108 P.R. Dec. 134 (1978), *translated in* 8 Offic. Trans. 138, 150 (1978) (holding that no Law 75 claim arose when the manufacturer increased prices by assigning the dealer's contract to an intermediary, thus adding the intermediary's mark-up to the dealer's cost, because the contract reserved the manufacturer's right to increase prices and to assign the contract).

■ Thus, "[t]he question whether there has been a 'detriment' to the existing relationship ... is just another way of asking whether the terms of the contract ... have been impaired." *Vulcan Tools*, 23 F.3d at 569. In this case, the terms of the contract were not impaired because the Amendment provides that it would terminate on March 31, 1991. CWS attempts to avoid this result by introducing evidence of its objections to the non-renewal of the Amendment, expressed in several letters to JVC in late March of 1991.[27] CWS's reaction to JVC's statement that the commissions arrangement

---

**26.** *Vulcan Tools* addressed the question whether a contract could be presumed to impaired by the creation of additional dealerships when the contract itself defined the relationship as a non-exclusive dealership. The holding was buttressed by the inclusion of express language in section 278a–1(b)(2), stating that its presumption of an impairment when the supplier creates additional dealerships attaches only if such an action is *"in conflict with the contract between the parties."* *Id.* (quoting P.R. Laws Ann. tit. 10, § 278a–1(b)(2) (Supp.1989)) (emphasis in *Vulcan Tools*) (internal quotation marks omitted). Thus, the *Vulcan Tools* holding arguably should not be expanded to apply beyond the context of the question of exclusivity of the distribution relationship. However, the court in *Vulcan*

*Tools* merely observed that this statutory provision was "[c]onsistent with our reading of the Act," *id.*, and nothing in the language of the opinion implies that the holding should not apply to any claim of impairment.

**27.** CWS also asserts that it "made this understanding clear to JVC both before and after it executed the [Amendment]." Pl.s' Mem. Law Opp'n at 33. However, CWS offers no evidence to support the factual contention that any such understanding was expressed before the execution of the contract, and at any rate, such an understanding was not incorporated into the Amendment.

would expire, CWS contends, shows that the parties intended and expected that the Amendment would be renewed.[28] However, the Court may not consider such extrinsic evidence of the parties' understandings if the contract is integrated [29] and if the term in question is clear. P.R. Laws Ann. tit. 32, App. IV, R. 69(B) (1994) (barring extrinsic evidence if "all terms and conditions constituting the true and final intention of the parties have been included"); P.R. Laws Ann. tit. 31, § 3471 (1994) ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.").

■ "Under Puerto Rico law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies, or difference of interpretation.'" *Executive Leasing Corp. v. Banco Popular*, 48 F.3d 66, 69 (1st Cir.) (quoting *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir.1987) (quoting *Heirs of Ramirez v. Superior Court*, 81 P.R.R. 347, 351 (1959))), *cert. denied*, — U.S. —, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995) (internal quotation marks omitted). In this case, the language of the Amendment is clear and unambiguous as to the termination date. Therefore, the Court "cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract." *Vulcan Tools*, 23 F.3d at 567 (quoting *Hopgood v. Merrill Lynch, Pierce Fenner & Smith*, 839 F.Supp. 98, 104 (D.P.R.1993), *aff'd mem.*, 36 F.3d 1089 (1994)) (internal quotation marks omitted). On the face of the Amendment, it

clearly states that the parties intended it to terminate on March 31, 1991, and therefore summary judgment in JVC's favor is warranted as to this claim.

### III. *Change in Credit Terms*

Next, JVC urges that it is entitled to summary judgment with respect to CWS's claim that the change in payment terms, from an open account arrangement to the "floor plan" arrangement, impaired the existing relationship in violation of Law 75. CWS invokes section 278a–1(b)(4)'s rebuttable presumption that a supplier has impaired an existing relationship if it "unilaterally and in an unreasonable manner varies ... the terms of payment ... to the prejudice of the dealer." JVC asserts that the Agreement itself—which states that "[n]either this Agreement nor any terms or conditions of sale established by JVC will require JVC to sell upon open account, and any such sales will be in the sole discretion of JVC," *e.g.*, Taffet Aff. Ex. 15 ¶ 4—reserves to JVC the right to change the terms of payment, and its variation of the terms in 1990 caused no impairment to that relationship.[30] The Court must agree.

■ As discussed above in Part II, Law 75's protection against impairment of an existing distribution relationship is limited by the terms of the contract establishing the relationship, and where "a dealer's contractually acquired rights have not been impaired in any way, Law 75 does not come into play." *Vulcan Tools*, 23 F.3d at 569. CWS argues that a broad application of the principles stated in *Vulcan Tools* is contrary to Law

**28.** CWS explains that the termination date represented the end of JVC's fiscal year, and was used only for accounting purposes.

**29.** In this regard, the Agreement provides that "[t]his Agreement contains the entire understanding of the parties with respect to its subject matter." *E.g.*, Taffet Aff. Ex. 15 ¶ 18(a). The Agreement, including this integration clause, is incorporated into the Amendment by reference. Although an integration clause is not necessarily conclusive proof of the fact of integration, it is powerful evidence in the absence of any evidence of non-integration. *Cf. Borschow Hosp. & Med. Supplies v. Cesar Castillo, Inc.*, 882 F.Supp. 236, 240 (D.P.R.1995) (quoting an integration clause as the evidence of integration), *aff'd*, 96 F.3d 10 (1996).

**30.** JVC also urges that CWS suffered no detriment from the change in credit terms because Chrysler's payment terms were more advantageous to CWS than CWS's previous arrangement with JVC. JVC further contends that it had just cause for its actions, because CWS's pattern of invoice payments gave JVC concern that CWS would increasingly be delinquent, and/or because CWS's intercompany loans to its affiliated companies selling competing product lines at the same time that its account with JVC was delinquent represented bad faith or a conflict of interest. As will be seen, the Court need not reach these arguments.

75's overall purpose, because any supplier would be able to use its superior bargaining position to exact contractual terms to defeat the presumptions stated in section 278a–1(b). However, CWS points to no authority—nor can the Court find any precedent—directing that any term of a contract, other than a clause "reserving to the parties the unilateral right to terminate the existing relationship," P.R. Laws Ann. tit. 10, § 278a, must be disregarded under Law 75.

Nor does any case law suggest that *Vulcan Tools*'s holding can only apply to overcome the statutory presumption regarding creation of additional dealerships, *see* § 278a–1(b)(2), and should not apply to overcome the presumption regarding variation of the terms of payment, *see* § 278a–1(b)(1). Rather, the *Vulcan Tools* holding is applicable to section 278a–1(b) as a whole. Section 278a–1(b), unlike section 278a, does not contain language indicating that any term of the dealer's contract should be disregarded in determining the parties' rights and obligations. Instead, section 278a–1(b) refers only to impairment of the existing relationship, which, as *Vulcan Tools* states, "is bounded by the distribution agreement." *Vulcan Tools*, 23 F.3d at 569. In this case, the existing relationship was bounded by the Agreement, and the Agreement provides that JVC was never obligated to sell on open account. Thus, JVC's discontinuation of its practice of doing so did not impair a contractually acquired right. Summary judgment in JVC's favor is granted.

## IV. *Suspension of Product Shipment*

Fourth, JVC seeks summary judgment with respect to CWS's claim that JVC impaired the distribution relationship when, from April to June of 1992, it suspended shipments of merchandise. CWS invokes section 278a–1(b)(3)'s rebuttable presumption that the existing relationship has been impaired when "the principal or grantor unjustifiably refuses or fails to fill the order for merchandise sent to him by the dealer in reasonable amounts and within a reasonable time." JVC counters that CWS's failure to execute the Agreement—from September or October of 1991, when the Proposed Contract was presented, until June 10, 1992, when the

revised Agreement was executed—supports JVC's refusal to ship. Furthermore, JVC argues, the delinquency of JVC's account with Chrysler at around the same time, resulting in Chrysler's refusal to approve orders for shipment, also provided justification for the suspension of shipments. Finally, JVC contends that plaintiff cannot prove any damages resulting from the shipment stoppage. The Court finds that summary judgment with respect to this claim is warranted due to the lack of evidence of damages.

First, JVC relies on *Nike Int'l Ltd. v. Athletic Sales, Inc.*, 689 F.Supp. 1235, 1239 (D.P.R.1988), for the broad principle that Law 75 does not "impede[ ] the expiration of the Distributor Agreement when the *dealer* elects to disregard the stipulated procedures to notify the principal of a desire to renew the relationship." JVC argues that CWS's decision not to execute the Agreement until June of 1992 supplied the justification for its refusal to ship. However, *Nike Int'l* addressed the case of a dealer's disregard of express terms of the distribution contract itself, requiring advance written notice of the dealer's desire to renew the contract. In the case at bar, it is not contended that CWS disregarded any express "stipulated procedure" in the Agreement, but rather that JVC's policy required receipt of a signed Agreement in order to release the shipments.

JVC has not demonstrated the absence of a genuine dispute as to material issues of fact regarding whether JVC's refusal to ship was justifiable in light of the lack of signed Agreement. Law 75 prohibits indirect as well as direct actions causing detriment to the parties' relationship. With respect to this claim, a jury could, on the record presented, find that JVC impaired the existing distribution relationship indirectly, by presenting a version of the Agreement—the Proposed Contract—that would be so clearly unacceptable to CWS that JVC should be deemed to have intended to force CWS to refuse to renew the Agreement. Thus, a jury could reasonably conclude that JVC's inclusion of paragraph 11(d) in the Proposed Contract amounted to an attempt indirectly to terminate the Agreement or to provide an

excuse to suspend shipments.[31] Of course, the jury would have to view the evidence in support of such a theory in light of the fact that CWS never directly alluded to any objection to paragraph 11(d) until the April 24, 1992 meeting, six months or more after the Proposed Contract was originally presented to CWS.[32]

Nor can JVC obtain summary judgment on the basis of its contention that any inventory shortages that CWS may have suffered were not caused by the dispute over the Proposed Contract but rather by CWS's delinquency on the Chrysler account, which led to Chrysler's refusals to approve shipments during this period. According to Gentry, the Chrysler employee who administered the CWS account, problems with late payments began to arise in April of 1992, and the matter came to a head at the end of June of 1992, when Chrysler informed CWS that no approvals of shipments would be issued until the delinquent payments and financial documents were forthcoming. JVC points to no evidence, nor can the Court find any in the record, to show that Chrysler withheld inventory order approvals in the relevant period, before June 30, 1992, when Chrysler informed CWS that it was halting order approvals.

■■■■ Nevertheless, summary judgment must be granted on the basis that CWS lacks evidence of damages resulting from the suspension of shipments. The party moving for summary judgment can carry its burden of proof by presenting evidence that negates an element of the nonmovant's claim or by pointing to the absence of any evidence supporting such an element, including the element of damages. *See Draft–Line*, 781 F.Supp. at 846. JVC does not endeavor to negate an element of CWS's claim, by presenting evidence that CWS was not damaged,[33] but instead relies on its contention that CWS has failed to present documentation of any dealer sales that were cancelled because of inventory shortages, or evidence of other losses resulting from the shipment stoppage.

Evidence of the existence of damages is not entirely absent in this case. Unlike the plaintiff in *Draft–Line*, who apparently relied solely on the allegation in its complaint to the effect that "there were damages," *id.*, CWS presents the affidavit and deposition testimony of a CWS employee who had contemporaneous, first-hand knowledge of the situation caused by JVC's suspension of shipments. *See* Reyes Jr. Aff. ¶ 75; Taffet Reply Aff. Ex. A vol. IV at 74–76. Hector Reyes Almodovar ("Reyes Jr."), the son of CWS's founder and president, was a CWS employee with responsibilities that over the years included purchasing and pricing, sales to retailers, and advertising and marketing. He testifies in his deposition that he discussed with his father the situation in the spring of 1992, and that, because of shipment stoppages, CWS did not have enough product on hand to supply retailers for the crucial Mother's Day season. *See* Taffet Reply Aff. Ex. A vol. IV at 75–76. Reyes Jr.'s affidavit specifies that CWS suffered damages because of cancellation of a prepaid Mother's Day advertising campaign, non-delivery of retailer sales, and resulting losses of good will.

**31.** JVC's contention that CWS should have executed the Agreement in April—once JVC consented to delete the general release clause, thus avoiding the shipping stoppages—is unavailing. CWS presents evidence that no resolution was reached at the April 24, 1992 meeting; further, neither party presents clear evidence as to when the 1991–92 Agreement—with its deletion of paragraph 11(d)—was offered for execution. Thus, a jury *might reasonably* attribute CWS's failure to execute the Agreement between April and June of 1992 to JVC's intransigence rather than CWS's.

**32.** On the other hand, a jury might view CWS's references to concerns it had about the "problems" with BWAC as a veiled reference to potential legal claims that CWS might assert in relation to the loss of the BWAC account. Since these claims would potentially have been waived under paragraph 11(d), CWS's references to the BWAC situation could reasonably be seen as a somewhat oblique reference to the release clause. In the context of the rapidly declining relationship between JVC and CWS, it might be understandable to a jury that CWS would be reluctant to state outright that it would refuse to sign the release clause.

**33.** The defendant in *Draft–Line*, for example, produced evidence negating the plaintiff's assertion of damages, by presenting income tax returns tending to show that the plaintiff's sales had increased. *See id.*

However, in order to award any damages as to this claim, a jury would not only have to credit the testimony of CWS's witnesses that such damages were incurred and were caused by JVC's actions, but would have to base its calculation of the damages on some evidence. *See Computec Sys. Corp. v. General Automation, Inc.,* 599 F.Supp. 819, 827 (D.P.R.1984) (citing *White Star Bus Line v. Glenn Falls Indem. Co.,* 60 P.R.R. 830, 839 (1942)). Reyes Jr.'s testimony could reasonably lead a jury to conclude that damages—in the form of a cancelled promotional campaign and cancelled retailer orders—existed, and that such damages were caused by JVC's suspension of shipment in connection with the dispute over the Proposed Contract. However, neither his testimony nor any document or other evidence in the record would support any valuation of such damages. The evidence presented does not even include an *estimate* of the amount paid in advance for the cancelled promotional campaign or of the lost revenue due to cancelled sales or to loss of good will.

■ "Although once the reality or existence of the damage and its connection to the detrimental act or breach is proven its exact valuation need not be established with mathematic certainty, its calculation must at least rest on a reasonable basis and not on mere speculation or guess." *Id.* On the basis of the record presented, it is clear that, in order to award any sum of damages, a trier of fact would have to engage in speculation and guesswork in assigning a value to CWS's alleged losses. Accordingly, the motion for summary judgment must be granted.

### V. *Imposition of Unreasonable MPRs*

■ Fifth, JVC moves for summary judgment on the claim that "[i]n or around 1991 and 1992, JVC forced Caribbean to accept sales quotas which were knowingly unreasonable." Am. & Supplemental Compl. ¶ 13(e). JVC contends that CWS actively negotiated the MPRs, which were reduced at CWS's request based upon its own evaluations of the Puerto Rico market, for the contract periods beginning October 1, 1990 and October 1, 1991. For the contract period beginning October 1, 1992, the previous year's MPRs were maintained, and JVC contends that CWS executed without objection the annual rider renewing the Agreement and MPRs. This evidence, JVC argues, negates an essential element of CWS's claim that the sales quotas in force at any time in 1991 or 1992 were unreasonable, in that it shows that the MPRs were bargained for and were based upon CWS's evaluation of the market. CWS presents no evidence or argument with respect to this claim, and the Court can find no precedent for an impairment claim based upon the setting of quotas.[34] Because CWS has failed to oppose the granting of summary judgment as to this claim, the motion is granted.

### VI. *Formal Termination of the Dealer's Contract*

Sixth, JVC seeks summary judgment with respect to CWS's claim that the 1993 termination of the Agreement was without just cause and therefore constituted a violation of section 278a. By July of 1993, when JVC terminated the Agreement, CWS had (1) established a pattern of untimely payments to JVC and to Chrysler; (2) remained delinquent in its payments to Chrysler such that Chrysler had not approved any credit orders to JVC for over a year; (3) experienced dwindling sales of JVC products; (4) brought suit against JVC; (5) and agreed to a settlement of its debts to Chrysler requiring it to release nearly all of its JVC inventory to Chrysler. CWS argues that, because these facts were known to JVC when, in November of 1992, JVC renewed the Agreement, there is at least a triable issue of fact whether CWS's conduct actually motivated JVC's termination of the Agreement.

---

**34.** The only argument that can be construed as addressing the issue of the reasonableness of any MPRs is included in CWS's discussion of its termination claim. In that portion of its brief, CWS argues that the reasonableness of the 1992–93 MPRs is a triable issue of fact going to JVC's burden of showing just cause for the termination of the Agreement, thus defeating summary judgment as to the termination claim. *See* Pl.'s Mem. Law Opp'n at 37–38. The argument, therefore, does not address the question whether summary judgment is appropriate as to CWS's claim that its distribution relationship was impaired by the setting of unreasonable MPRs.

■ Notably, it is not clear that a supplier's renewal of a contract when it knows of conduct by the dealer can defeat the supplier's later assertion that such conduct was just cause for the termination of the relationship. Where a court can rule as a matter of law that a dealer's conduct constitutes just cause for termination, the question whether or not the supplier exercised its right to terminate at its earliest opportunity to do so would not create any issue of fact as to whether the just cause existed. At any rate, in this case, conduct by the dealer postdating the 1992 renewal provides ample cause for the termination. As of November of 1992, CWS had been delinquent in payments to Chrysler for seven months, and had not received any approvals of credit orders for five months. But by July 28, 1993, when JVC sent the termination notice, CWS's payment delinquencies had continued for over a year. Furthermore, by that time, CWS had agreed to hand over all of its JVC merchandise to Chrysler. The inventory was merchandise that CWS had warehoused, unsold, for over a year, and after releasing it to Chrysler, CWS obviously would not be in a position to promote or sell those products. Finally, by that time CWS had brought suit against JVC.

The Court would be reluctant, in the absence of guidance from the Puerto Rico courts, to hold that the bringing of suit under Law 75, standing alone, could as a matter of law constitute a sufficient breach of the dealer's duty of good faith, See An–Port, 772 F.Supp. at 1314, to be deemed just cause for termination. However, the litigation, combined with CWS's financial problems—resulting in its inability to obtain from Chrysler the necessary approvals of JVC orders, and in the release of almost all its remaining JVC inventory—clearly show that CWS was unable to continue to fulfill "the essential obligations of the dealer's contract," the marketing and sale of JVC products. P.R. Laws Ann. tit. 10, § 278(d) (1994) (defining "just cause").

## VII.  Post–Termination Sales

CWS's brief in opposition to the motion for summary judgment raises for the first time a claim not made in the complaint. CWS asserts that JVC's direct sales in Puerto Rico after the termination of the Agreement with CWS further impaired the distribution relationship, invoking a presumption of impairment by the creation of facilities for direct distribution under section 278a–1(b)(1). CWS in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion. Summary judgment cannot be granted as to this "claim" because it is not a claim. To the extent that CWS contends that any such claim can be asserted by amending the complaint, it may seek leave to do so by the filing of an appropriate motion.

## VIII.  JVC's Contract Claim Under the 1992–93 MPRs

■ CWS cross-moves for summary judgment as to JVC's claim that CWS breached the Agreement by failing to meet the MPRs set for the 1992–93 contract period. CWS contends that both section 278a–1(c) and a clause of the Agreement preclude liability on this claim. First, Law 75 bars a supplier from invoking the failure to meet sales quotas as a reason for terminating a distribution relationship, unless the supplier can show that the quotas were based upon a realistic evaluation of the Puerto Rico market. Second, paragraph 7(e) [35] of the Agreement sets forth that "[n]either JVC nor DISTRIBUTOR shall be liable to the other, or to any other person, solely by reason of the expiration or termination of this Agreement." Accordingly, CWS argues, "it is clear that JVC has no affirmative right to seek damages based upon any alleged breach of the MPR." Pl.'s Mem. Law. Supp. Cross–Mot. at 3.

The Court does not find support, in the statute or the Agreement, for such a conclusion. Both section 278a–1(c) and paragraph

---

**35.** The paragraph which follows paragraph 7(d) is actually labelled "(c)," but for the sake of clarity, this opinion refers to and cites the relevant passage as paragraph 7(e).

7(e) relate to termination of the Agreement. The termination of the Agreement is not the issue posed by JVC's claim. First, JVC does not assert that the alleged breach of the MPRS justified the termination of the Agreement;[36] second, JVC does not seek damages "solely by reason of the expiration or termination" of the Agreement. Rather, JVC claims that it was damaged by the alleged breach of the MPRs. In the absence of any other evidence or argument supporting summary judgment, the motion must be denied.

## IX. JVC's Contract Claim Under the Forum Selection Clause

Lastly, CWS seeks summary judgment with respect to JVC's claim that CWS breached the Agreement's forum selection clause by bringing its Law 75 claims in a Puerto Rico court rather than New York, the forum designated in the Agreement. First, CWS argues that "the distributor agreement upon which JVC relies expressly preclude[s] the recovery of damages." Pl.'s Mem. Law Supp. Cross–Mot. at 5. CWS does not cite any portion of the Agreement to substantiate this assertion, and the Court can find no such term in the contract, unless the assertion is construed as a repetition of the misdirected argument, applied by CWS with respect to JVC's claim for violation of the MPRs, that paragraph 7(e) prohibits this cause of action. For the reasons stated in Part VIII, this argument is unavailing.

Second, CWS argues that the claim must fail as a matter of law because Law 75 expressly provides that "any stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract outside of Puerto Rico ... [is] null and void." P.R. Laws Ann. tit. 10, § 278b–2. Both this Court and the District Court of Puerto Rico have stated that the forum selection clause is enforceable. See Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., No. 93–2053(HL), op. at 8 (D.P.R. Nov. 15, 1993); Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,

No. 93–8197(PKL), op. at 4 (S.D.N.Y. Mar. 27, 1996) (recognizing that the Puerto Rico District Court's "decision transferring the action expressly upheld the validity of the forum selection clause"). Therefore, JVC argues, it is the law of the case that the clause is enforceable, and summary judgment should be denied.

The Court does not agree. The prior rulings in this case pertained to the enforceability of the clause only as it relates to the procedural question of transfer of venue. As the Puerto Rico District Court observed, in a diversity suit, such procedural questions are guided by federal common law. See Caribbean Wholesales & Serv. Corp., No. 93–2053(HL), op. at 8. Federal precedent regarding the enforceability of forum selection clauses to determine the *jurisdictional* question is rigorous in demanding a compelling showing of reasons to disregard the existence of such a clause. See id. at 7. However, the enforceability of the clause *as a contractual obligation* or theory of recovery of damages is a matter of substantive law, and therefore in a diversity suit is governed by state law. See Hanna v. Plumer, 380 U.S. 460, 465, 85 S.Ct. 1136, 1140–41, 14 L.Ed.2d 8 (1965); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–23, 82 L.Ed. 1188 (1938). This Court has previously ruled, evaluating the action under New York choice of law doctrines, that both CWS's Law 75 claims and JVC's contract claims are governed by Puerto Rico law. See Caribbean Wholesales & Serv. Corp., No. 93–8197(PKL), op. at 5–8. The forum selection clause at issue clearly falls within the ambit of Law 75's provision, and is null and void for the purposes of recovery of damages under a contract theory. Accordingly, summary judgment as to this cause of action must be granted.

## CONCLUSION

For the reasons stated in the foregoing, defendant JVC's motion for summary judg-

---

**36.** Moreover, the Law 75 provision invoked by CWS does not imply that, if a reasonable MPR is breached, the supplier's only remedy is to terminate the contract. In fact, the provision has nothing to do with a supplier's contractual rights with respect to quotas themselves. It merely establishes the burden of proof borne by a supplier when it asserts that the failure to meet a quota constituted its just cause for termination.

ment is HEREBY DENIED with respect to CWS's claim of impairment by direct sales to BWAC; the motion is HEREBY GRANTED with respect to all other claims. Plaintiff CWS's cross-motion for summary judgment is HEREBY DENIED with respect to JVC's counterclaim for damages relating to alleged breaches of sales quotas; and CWS's cross-motion is HEREBY GRANTED with respect to the claim for damages relating to the alleged breach of the forum selection clause. The parties are directed to appear for a pre-trial conference in Courtroom 18B at 500 Pearl Street on June 13, 1997 at 11:30 a.m.

**SO ORDERED.**